IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| COTTONWOOD ENVIRONMENTAL LAW CENTER, MONTANA RIVERS, and GALLATIN WILDLIFE ASSOCIATION,<br><br>Plaintiffs,<br><br>vs.<br><br>RON EDWARDS, in his official capacity as Manager of the Big Sky Water and Sewer District; and BIG SKY WATER AND SEWER DISTRICT,<br><br>Defendants. | 2:20-cv-00028-BU-BMM<br><br>**ORDER** |

**INTRODUCTION**

Cottonwood Environmental Law Center, Montana Rivers, and Gallatin Wildlife Association ("Plaintiffs") brought this action against Ron Edwards in his official capacity as Manager of the Big Sky and Sewer District and Big Sky Water and Sewer District (collectively, "Big Sky District"). Plaintiffs allege that Big Sky District violated the Clean Water Act ("CWA") when they discharged pollutants into the West Fork of the Gallatin River without a National Pollutant Discharge Elimination System (NPDES) permit. (Doc. 8). Plaintiffs filed a Motion for

Preliminary Injunction on February 3, 2021. (Doc. 21). The Court held a hearing on the motion on March 16, 2021. (Doc. 33).

## BACKGROUND

*Statutory Background*

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish that goal, Congress prohibited the "addition" of any pollutant from a "point source" to "navigable waters" without a NPDES permit. *Id.* § 1311(a). The CWA authorizes the Administrator of the U.S. Environmental Protection Agency ("EPA") or a delegated state agency to issue a NPDES permit to an entity that seeks to discharge pollution into navigable waters. *See EPA v. California ex rel. State Water Resources Control Bd.*, 426 U.S. 200, 202–03 (1976); *Milwaukee v. Illinois*, 451 U.S. 304, 310–311 (1981). EPA authorized the Montana Department of Environmental Quality ("MT DEQ") to run its own discharge permit system, known as the Montana Pollutant Discharge Elimination System ("MPDES").

The CWA discharge prohibition operates primarily through a series of definitions. The CWA defines "pollutant" broadly to include any solid waste, sewage, incinerator residue, heat, discarded equipment, sand, as well as industrial, municipal, and agricultural waste. 33 U.S.C. § 1362(6). It further defines a "point source" as "any discernible, confined and discrete conveyance . . . from which

pollutants are or may be discharged," including, for example, any "pipe, ditch, channel, tunnel, conduit" or "well." *Id.* § 1362(14). The CWA defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." § 1362 (12). Finally, the CWA defines "navigable waters" to encompass the oft-evasive "waters of the United States." *Id.* § 1362(7).

Congress provided citizen plaintiffs with the opportunity to enforce the CWA. *Id.* § 1365. CWA citizen plaintiffs must notify defendants and the relevant federal and state agencies of their intent to sue at least 60 days before filing suit. 33 U.S.C. § 1365(b)(1)(A). "The notice requirement and the 60-day delay are intended to give government regulators an opportunity to take action, and to give alleged violators an opportunity to comply with the [CWA]." *San Francisco Baykeeper v. Tosco Corp.*, 309 F.3d 1153, 1157 (9th Cir. 2002). A court lacks subject matter jurisdiction over the citizen suit where a plaintiff fails to provide adequate notice and must dismiss the action. *Nat. Resources Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 995 (9th Cir. 2000).

*Factual Background*

Big Sky District provides wastewater and sewer services for the resort community at Big Sky, Montana. Big Sky District's service area encompasses over 6,000 acres and includes single-family residences, condominiums and townhouses, hotels, restaurants, and commercial centers. Big Sky District collects water from

district water users for treatment at its Water Resources Recovery Facility ("WRRF"). Big Sky District first constructed a water treatment facility to process wastewater in the 1970s.

The current WRRF began operations in 1996. The Big Sky community—and therefore the Big Sky District's user base—has grown significantly in recent years. Big Sky District upgraded the WRRF in 2004 to increase its treatment capacity. MT DEQ noted, however, that the WRRF "is at capacity and does not allow the District to produce reclaimed effluent of the quality needed for reuse activities." (Doc. 23-1 at 3). MT DEQ further opined that the WRRF is "pushed to the limit during wet-weather and spring run-off conditions . . . resulting in elevated nitrogen, biological oxygen demand and total suspended solids leaving the treatment facility." (Doc. 23-1 at 2–3). Big Sky District recently began the process to build a new treatment center. That process remains in early stages.

The WRRF treatment process removes debris and grit, treats nitrogen through aerobic and anaerobic conditioning, filters the water, and finally disinfects the water. Big Sky District stores the resulting treated effluent in lined holding ponds at the WRRF. Big Sky District disposes of all its treated effluent through irrigation—primarily by irrigating the neighboring Meadow Village Golf Course during the summer months.

Although wastewater goes through a significant treatment process at the WRRF, the treated effluent retains many pollutants, including nitrogen. Excess nitrogen causes algae blooms in rivers and streams that can harm aquatic animal and plant life. Big Sky District and MT DEQ developed a Nutrient Management Plan ("NMP") that governs irrigation of the Meadow Village Golf Course to ensure that the turf grass and plants along the course take up any nitrogen delivered through irrigation. (Doc. 22-1 at 11–12, 16, 25). The NMP's goal remains to prevent excess nitrogen and other nutrients from leaching into the groundwater and migrating into surface waters. (Doc. 22-1 at 11, 16, 25). Boyne U.S.A., Inc. ("Boyne"), the Meadow Village Golf Course owner and operator, is not a party to the NMP. Rather, Big Sky District solely controls the quality, quantity, and timing of effluent used in irrigation in compliance with the NMP. Big Sky District also tracks compliance with the NMP through its operation of lysimeters to monitor nutrient levels on the Meadow Village Golf Course. (Doc. 22-1 at 19–21).

Plaintiffs allege that Big Sky District over-irrigated the Meadow Valley Golf Course, and that nitrogen and other pollutants flowed downhill and leached into the groundwater. This groundwater naturally sits in aquifers beneath Big Sky District's lined holding ponds. The groundwater in these aquifers is hydrologically connected to the West Fork of the Gallatin River. If the groundwater level rises too high, the groundwater would "float" the holding pond liner. This floating of the holding

pond liner, in turn, would lead to effluent spillover from the holding pond. Big Sky District diverts groundwater under its holding ponds into the West Fork of the Gallatin River using an underdrain pipe system to prevent such spillover.

The West Fork of the Gallatin River flows alongside the WRRF, the treated effluent holding ponds, and the Meadow Village Golf Course. In 2010, MT DEQ placed the West Fork of the Gallatin River on its CWA Section 303(d) list of water quality impaired streams. (Doc. 23-3 at 76 (citing 33 U.S.C. § 1313(d))). To address the water quality issue, in 2010, MT DEQ published a Total Maximum Daily Load ("TMDL") and corresponding water quality improvement plan to clarify the maximum amount of nitrogen that the West Fork of the Gallatin River could receive and still meet state water quality standards. (Doc. 23-3 at 76–79). MT DEQ observed that nitrogen levels in the West Fork of the Gallatin River already exceed that maximum quantity, and that river nitrogen originates from sources including "improper management of land-applied effluent." (Doc. 23-3 at 83–86).

Plaintiffs allege that Big Sky District must seek a NPDES permit for the discharge of nitrogen originating in its holding ponds and entering the West Fork of the Gallatin River via the underdrain pipe system. The West Fork of the Gallatin River represents a navigable water. Big Sky District does not currently hold a NPDES permit to discharge pollutants to the West Fork of the Gallatin River.

6

Plaintiffs' allegations present two questions: whether pollutants originating from the holding ponds reach the West Fork of the Gallatin River, and whether that path represents a discharge of pollutants to a navigable water in violation of the CWA.

*Legal Standard*

The issuance of a preliminary injunction represents an extraordinary remedy that should not be awarded as a matter of right, but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff who seeks a preliminary injunction or temporary restraining order must establish four elements: 1) that it likely will succeed on the merits; 2) that it likely will to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in its favor; and 4) that an injunction will serve the public interest. *See id.* at 20. Courts in the Ninth Circuit apply a sliding scale approach to preliminary relief. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

The reviewing court must balance the elements "so that a stronger showing of one element may offset a weaker showing of another." *Id.* Even "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

# ANALYSIS

## I. Preliminary Injunction Analysis

Plaintiffs allege that Big Sky District violated the CWA when it discharged pollutants from its holding ponds via the underdrain pipe system into the West Fork of the Gallatin River without a NPDES permit. Plaintiffs seeks a preliminary injunction that would require Big Sky District to take the following actions: 1) stop connecting any new sewer lines to the district sewer system; 2) cease irrigating the Meadow Village Golf Course on days not approved by MT DEQ; 3) cease irrigating the Meadow Village Golf Course with treated effluent that exceeds a nitrogen concentration of 10 mg/l; and 4) publish daily the nitrogen concentration of wastewater that is used to irrigate the golf course. (Docs. 22 & 28).

### a. Success on the Merits

Big Sky District argues that Plaintiffs remain unlikely to succeed on the merits. Big Sky District makes two arguments in particular: 1) that the Court lacks subject matter jurisdiction because Plaintiffs failed to provide adequate notice of suit under the CWA; and 2) that Plaintiffs failed to allege a valid CWA violation. The Court addresses each argument in turn.

#### i. Lack of Subject Matter Jurisdiction

The CWA requires citizen plaintiffs to notify defendants and the relevant federal and state agencies of their intent to sue at least 60 days before filing suit. 33

U.S.C. § 1365(b)(1)(A). "The notice requirement and the 60-day delay are intended to give government regulators an opportunity to take action, and to give alleged violators an opportunity to comply with the [CWA]." *San Francisco Baykeeper*, 309 F.3d at 1157. A court lacks subject matter jurisdiction where a plaintiff fails to provide adequate notice to a potential defendant and to the relevant regulatory bodies. *Nat. Resources Def. Council*, 236 F.3d at 995.

EPA's regulations clarify that notice must include "sufficient information to permit the recipient to identify . . . the activity alleged to constitute a violation." 40 C.F.R. § 135.3(a). A plaintiff must describe alleged violations of the CWA with "reasonable specificity." *San Francisco Baykeeper*, 309 F.3d at 1158. Proper notice need not perfectly describe the violation, but rather must adequately provide "information that allow[s] the defendant to identify and address the alleged violations, considering defendant's superior access to information about its own activities." *Puget Soundkeeper Alliance v. Cruise Terminals of America*, 216 F. Supp. 3d 1198, 1210 n.7 (W.D. Wash. 2015) (quoting *Klamath Siskiyou Wildlands Center v. MacWhorter*, 797 F.3d 645, 651 (9th Cir. 2015)).

Plaintiffs sent its notice of intent to sue to Big Sky District, EPA, and MT DEQ on April 22, 2020. (Doc. 26-2). Plaintiffs' 60-day notice alleged that the WWRF holding ponds are "illegally discharging waste water into the West Fork of the Gallatin River without a permit." (Doc. 26-2 at 7). The letter included an image

9

of the hill face where the Big Sky District's underdrain pipe system releases groundwater into the West Fork of the Gallatin River. (Doc. 26-2 at 5). Plaintiffs sent additionally a supplemental notice of intent to sue on June 9, 2020. (Doc. 26-2 at 11). The supplemental notice included another image of the same underdrain pipe system, related seepage, results from water quality sample tests, as well as an indication on a map where Plaintiffs collected those samples. (Doc. 26-2 at 14–18).

Plaintiffs alleged that pollutants from the holding ponds reached the West Fork of the Gallatin River via the underdrain pipe system. Big Sky District retained significant knowledge of the hydrology of the area through its development of a NMP with MT DEQ that specifically centered on the potential seepage of nutrients from golf course irrigation into the groundwater and the West Fork of the Gallatin River. (Doc. 22-1 at 11–25). Big Sky District deployed water from its effluent ponds for irrigation use, controlled the quality and quantity of irrigation water, tracked nutrient uptake with lysimeters, and controlled and maintained the pipe diverting groundwater to the West Fork of the Gallatin River pictured in Plaintiffs' letters. Plaintiffs lacked knowledge of the precise hydrological path of pollutants from the holding ponds to the underdrain pipe system. Plaintiffs provided adequate information, however, to put Big Sky District on notice of its alleged violation based on its superior access to information regarding the hydrology of the area. *See Puget Soundkeeper Alliance*, 216 F. Supp. 3d at 1210 n.7 (quoting *Klamath*

*Siskiyou Wildlands Center*, 797 F.3d at 651). Plaintiffs satisfied the CWA notice requirements. *See San Francisco BayKeeper*, 309 F.3d at 1158.

### ii. Alleged CWA Violation

The CWA prohibits the "addition" of any pollutant from a "point source" to "navigable waters" without a NPDES permit. 33 U.S.C. § 1311(a). Plaintiffs presents several theories in support of its allegation that Big Sky District discharged pollutants from its holding ponds into the West Fork of the Gallatin River.

Plaintiffs first argue that the mere movement of the nitrogen and other pollutants through the underdrain pipe violates the CWA. Plaintiffs cite precedent indicating that "a point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters'" *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 105 (2004). Plaintiffs fail to recognize, however, that this precedent requires a showing that such a conveying point source must connect two otherwise unconnected water bodies. *See id.* at 112 (remanding for a finding whether the two water bodies at issue are "meaningfully distinct water bodies"). The parties agree that the groundwater and the West Fork of the Gallatin River represent a hydrologically connected water body. It remains unclear from the factual record that the mere conveyance of pollutants from one part of this interconnected system to another would violate the CWA.

Plaintiffs next argue that the groundwater discharged from the pipe itself constitutes a pollutant. Plaintiffs raise precedent indicating that groundwater itself constitutes a pollutant. *See N. Plains Res. Council v. Fid. Expl. & Dev. Co.*, 325 F.3d 1155, 1160 (9th Cir. 2003). Plaintiffs fail to recognize, however, that this precedent relied on the classification of groundwater as a pollutant because the groundwater constituted "industrial waste"—a useless byproduct of the coal bed methane extraction process. *See id.* at 1160–61. It remains unclear from the factual record that Big Sky District's diversion of hydrologically connected groundwater to the West Fork of the Gallatin River to prevent its pond liners from floating would constitute a similarly useless byproduct of an industrial process.

The U.S. Supreme Court's recent decision in *Cty. of Maui, Hawaii v. Hawaii Wildlife Fund* provides the most likely legal theory applicable to this case. 140 S. Ct. 1462 (2020). Plaintiffs argue that Big Sky District discharges pollutants from its holding ponds into the West Fork of the Gallatin River. The hydrology of the system at issue does not support a direct discharge theory—rather, the pollutants allegedly move along the following path: from the ponds, to the golf course, to the groundwater, and then to the West Fork of the Gallatin River. The Supreme Court concluded that the CWA prohibits the indirect discharge of pollutants to surface waters without a NPDES permit if the indirect discharge represents "*the functional equivalent of a direct discharge.*" *Id.* at 1476 (emphasis in original).

12

The functional equivalent analysis requires a fact-intensive inquiry of the discharge at issue. The Supreme Court provided a set of principles for courts engaging in functional equivalent analysis. *See id.* at 1477 (comparing such decisions to the development of common law). The Supreme Court articulated a non-exclusive list of seven factors for courts to apply in determining whether an indirect discharge is the "functional equivalent" of a direct discharge:

> (1) transit time, (2) distance traveled, (3) the nature of the material through which the pollutant travels, (4) the extent to which the pollutant is diluted or chemically changed as it travels, (5) the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source, (6) the manner by or area in which the pollutant enters the navigable waters, (7) the degree to which the pollution (at that point) has maintained its specific identity.

*Id.* at 1476–77. The Supreme Court further advised that "[d]ecisions should not create serious risks . . . of creating loopholes that undermine the [CWA's] basic federal regulatory objectives." *Id.* at 1477.

At a basic level, "[w]hether pollutants that arrive at navigable waters after traveling through groundwater are 'from' a point source depends upon how similar to (or different from) the particular discharge is to a direct discharge." *Id.* at 1476. Plaintiffs' allegations then raise two questions: whether pollutants originating from the holding ponds reach the West Fork of the Gallatin River; and whether that path

represents the functional equivalent of a direct discharge of pollutants to a navigable water in violation of the CWA.

It appears unlikely that Plaintiffs' claims will succeed based on the record presented. The plaintiffs in *Maui* presented scientific research in the form of tracer dye studies that showed the path of pollutants from wells used to dispose of treated effluent, through groundwater, and into the Pacific Ocean. *Hawai'i Wildlife Fund v. Cty. of Maui*, 886 F.3d 737, 742–43 (9th Cir. 2018), *vacated and remanded sub nom. Cty. of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, (2020). Plaintiffs present evidence of elevated nitrogen in the West Fork of the Gallatin River. The origins of that nitrogen remain unclear from the record presented.

Plaintiffs' strongest evidence of the hydrological path of pollutants arises from a combination of the TMDL and NMP. The NMP seeks to prevent excess nitrogen and other nutrients from leaching into the groundwater and migrating into surface waters. (Doc. 22-1 at 11, 16, 25). This stated goal and its accompanying research provides evidence of the hydrological path from the holding ponds, to irrigation of the golf course, to the groundwater, and finally to the West Fork of the Gallatin River.

The TMDL presents multiple scientific studies that indicated nitrogen in the West Fork of the Gallatin River originated from treated effluent. (Doc. 23-3 at 111–12). For example, Montana State University researchers "used land-

application data (volumes and concentrations of wastewater applied to the golf course) . . . to model soluble nitrogen [] loading to the subsurface" and the river. (Doc. 23-3 at 111–12). Researchers using those models estimated that "nitrogen export from wastewater effluent sources account[] for 61% of instream [nitrogen] load in the West Fork Gallatin River." (Doc. 23-3 at 111–12 (citing Kristin K. Gardner, et al., *Quantifying watershed sensitivity to spatially variable N loading and the relative importance of watershed N retention mechanisms*, Water Resources Research (2011))). In other studies, Montana State University researchers "utilized isotopic analysis of water quality samples to further evaluate wastewater loading to the stream." (Doc. 23-3 at 101). This technique allowed researchers to distinguish wastewater nitrogen sources from other nitrogen sources. (Doc. 23-3 at 112). Researchers using those methods estimated that wastewater nitrogen contributed to 85% of the instream nitrogen load in summer, and 68% of the nitrogen load in the winter. (Doc. 23-3 at 112 (citing Kristin K. Gardner, et al., *Seasonality in spatial variability and influence of land use/land cover and watershed characteristics on stream water nitrate concentrations in a developing watershed in the Rocky Mountain West*, Water Resources Research (2009))).

MT DEQ and Big Sky District implemented the NMP in April 2012 to prevent nutrients from reaching the West Fork of the Gallatin River. The studies presented in the TMDL use data from the late 1990s to the mid-2000s—well

before implementation of the NMP. Plaintiffs have presented samples that show elevated nitrogen in the West Fork of the Gallatin River and around the alleged discharge point. Those samples in isolation do not provide evidence for the source of nitrogen in the groundwater at issue. The samples further fail to provide the kind of time, distance, and dilution data that the Court would require for its *Maui* inquiry. As a result, serious questions remain regarding Plaintiffs' success on the merits.

### b. Irreparable Harm

A court may grant a preliminary injunction or temporary restraining order to preserve the status quo pending final determination of an action. *See Textile Unlimited, Inc. v. A. BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001). In environmental cases, a preliminary injunction can prevent the destruction of natural resources while the case proceeds. *See, e.g.*, *Indigenous Env't Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 591 (D. Mont. 2018) (enjoining the construction of the Keystone XL pipeline border-crossing), *order amended and supplemented*, 369 F. Supp. 3d 1045 (D. Mont. 2018), *and appeal dismissed and remanded sub nom. Indigenous Env't Network v. U.S. Dep't of State*, No. 18-36068, 2019 WL 2542756 (9th Cir. June 6, 2019); *Sierra Club v. United States Forest Serv.*, 843 F.2d 1190 (9th Cir. 1988) (finding an injunction should have been granted to prevent logging of giant sequoia redwood forests because the U.S.

Forest Service failed to complete required environmental analysis); *Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) (affirming an order enjoining operation of a dam that would have eradicated the endangered snail darter).

Plaintiffs argue that an injunction proves necessary to prevent harm to the waters of the West Fork of the Gallatin River. (Doc. 22 at 14–15). Plaintiffs specifically point to the potential for algal blooms that will impact organization members who retain aesthetic, conservation, and recreation interests in those waters. (Doc. 22 at 14–15). Big Sky District argues that such harms do not represent the kinds of irreparable environmental harms generally contemplated when a court issues an injunction. (Doc. 26 at 22–24). Big Sky District notes that it has irrigated the Meadow Village Golf Course using treated effluent with MT DEQ approval since the 1970s. (Doc. 26 at 22–24). At argument, Big Sky District represented that irrigation would not commence until May at the earliest.

The irreparable harm factor weighs slightly against Plaintiffs, particularly considering the factual uncertainty of whether pollutants from the WRRF holdings ponds reach the West Fork of the Gallatin River. Plaintiffs provide the kind of member impact statements useful for standing analysis. Those statements fail to point to the kinds of irreparable harms, however, that would warrant the "extraordinary and drastic remedy" of injunctive relief. *Villegas Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012), 680 F.3d at 1072; *see also Winter*, 555 U.S.

17

at 22. Plaintiffs fail to present the irreparable harms that would remain at the West Fork of the Gallatin River after alleged pollutants wash away.

### c. Balance of Equities and Public Interest

The balance of the equities and public interest prongs present nearly identical analysis in this case. Big Sky District asserts that a preliminary injunction would disable its ability to treat wastewater from the Big Sky community because it could not dispose of its treated effluent. (Doc. 26 at 25–26). Big Sky District argues, in part, that "the public has a strong interest in the District maintaining a functional wastewater treatment and sewage system." (Doc. 26 at 26). Plaintiffs respond that the public retains a strong interest in preserving the water quality of the West Fork of the Gallatin River. (Doc. 28 at 14–17). Plaintiffs further argue that the current water treatment plant is "dysfunctional . . . and poses a risk to the surface water." (Doc. 28 at 15). The balance of equities and public interest prongs fail to tip the scales in either direction.

### d. Weighing the Factors

A preliminary injunction represents an extraordinary remedy, that should not be awarded as a matter of right, but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. A preliminary injunction proves inappropriate based on the record before the Court. Serious questions remain regarding the success of Plaintiffs' case. Plaintiffs fail to show irreparable injury.

And the balance of equities and public interest prove inconclusive. The Court will deny Plaintiffs' Motion for Preliminary Injunction. (Doc. 21).

## ORDER

Accordingly, **IT IS ORDERED** that:

- Plaintiff's Motion for Preliminary Injunction (Doc. 21) is **DENIED**.

Dated the 23rd day of March, 2021.

_____
Brian Morris, Chief District Judge
United States District Court