Jacqueline R. Papez
Cynthia D. Brooks
DONEY CROWLEY P.C.
P.O. Box 1185
50 South Last Chance Gulch, 3rd Floor
Helena, MT 59601
Telephone: (406) 443-2211
Facsimile:  (406) 449-8443
jpapez@doneylaw.com
cbrooks@doneylaw.com

Jonathan W. Rauchway (*Admitted Pro Hac Vice*)
Mave A. Gasaway (*Admitted Pro Hac Vice*)
Andrea M. Bronson (*Admitted Pro Hac Vice*)
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, CO 80202
Telephone:  (303) 892-9400
Facsimile:   (303) 893-1379
jon.rauchway@dgslaw.com
mave.gasaway@dgslaw.com

*Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MONTANA - BUTTE DIVISION

| | | |
|---|---|---|
| COTTONWOOD ENVIRONMENTAL LAW CENTER, et al., | ) ) ) ) | Case No. 2:20-cv-00028-BMM |
| *Plaintiffs,* | ) ) | DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' |
| vs. | ) ) | MOTION FOR SUMMARY JUDGMENT AND INJUNCTIVE |
| RON EDWARDS, in his official capacity as Manager of the Big Sky Water and Sewer District; and BIG SKY WATER AND SEWER DISTRICT, | ) ) ) ) ) ) | RELIEF |
| *Defendants.* | ) | |

# **TABLE OF CONTENTS**

Page

INTRODUCTION ..........................................................................................1

ARGUMENT ................................................................................................4

I.     THERE IS NO DIRECT DISCHARGE IN THIS CASE. .............................4

     A.     The District's storage ponds are not plumbed to the underdrain. .........5

     B.     The underdrain pipe does not add pollutants to surface waters. ..........6

II.    PLAINTIFFS' OVER-IRRIGATION THEORY LACKS AN
     ACTIONABLE POINT SOURCE, AND IS BASED ON DISPUTED
     FACTS IN ANY EVENT. ..............................................................7

     A.     Defendants do not own or operate the alleged golf course point
               sources and Plaintiffs misconstrue the *Maui* decision. ........................8

     B.     Any *Maui* analysis should start with the District's compliance
               with Montana's regulation of the alleged discharges, which is
               disputed. ............................................................................10

     C.     Consideration of the *Maui* factors implicates numerous disputed
               issues of material fact. .........................................................13

III.   INJUNCTIVE RELIEF IS NOT APPROPRIATE. .....................................18

     A.     Defendants have not violated the CWA, which precludes
               injunctive relief. ...................................................................18

     B.     The District could apply for a discharge permit. ...............................19

CONCLUSION ...........................................................................................21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## <u>Cases</u>

*Cnty. of Maui v. Hawaii Wildlife Fund,*
    140 S. Ct. 1462 (2020)..............................................................*passim*

*L.A. Cnty. Flood Control Dist. v. Nat. Res. Def. Council,*
    568 U.S. 78 (2013).............................................................6, 7

*ONRC Action v. U.S. Bureau of Reclamation,*
    798 F.3d 933 (9th Cir. 2015) ...............................................6

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*
    550 F.3d 778 (9th Cir. 2008) ..............................................11

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser,*
    945 F.3d 1076 (9th Cir. 2019) ..............................................4

*S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians,*
    541 U.S. 95 (2004)..............................................................6

## <u>Statutes</u>

33 U.S.C. § 1251 *et seq.* (1972).......................................................*passim*

33 U.S.C. § 1311(a) ...........................................................................6

33 U.S.C. § 1362(12) .........................................................................6

Mont. Code Ann. § 75-5-101 *et seq.*.................................................11

Mont. Code Ann. § 75-5-104 .............................................................11

## <u>Other Authorities</u>

Fed. R. Civ. P. 30(b)(6).....................................................................12

Fed. R. Evid. 701 ..............................................................................14

Fed. R. Evid. 702 ..............................................................................14

Mont. Admin. R. § 17.30.101 *et seq.*................................................11

Mont. Admin. R. § 17.30.1001 *et seq.*.......................................................11

Mont. Admin. R. § 17.30.1022(1)(g)..........................................................12

Mont. Admin. R. § 17.30.1023(3) ..............................................................11

Defendants Big Sky County Water & Sewer District No. 363 (the "District") and Ron Edwards, in his official capacity (collectively, "Defendants"), submit this brief in opposition to the Motion for Summary Judgment and Injunctive Relief ("Motion") filed by Plaintiffs Cottonwood Environmental Law Center, Montana Rivers, and Gallatin Wildlife Association (collectively, "Plaintiffs").

## **INTRODUCTION**

Plaintiffs' Motion is replete with factual errors, misstatements of the law, and—above all—expert opinion masquerading as established fact.  Plaintiffs claim the District's ponds discharge over 21 million gallons of treated effluent each year to the West Fork of the Gallatin River ("West Fork").  This is the opinion of Plaintiffs' expert, not a fact, much less an undisputed fact.  Defendants' expert concluded that pond leakage is de minimis, far less than the Montana Department of Environmental Quality's ("DEQ") standard for the allowable leakage per year, and that there is no direct discharge to the West Fork.

Plaintiffs also claim the District over-irrigates the Meadow Village golf course resulting in a massive discharge of pollutants to the West Fork.  Again, this is the opinion of Plaintiffs' expert, not an undisputed fact.  Defendants' expert performed an analysis of golf course irrigation and concluded it was within agronomic limits established by DEQ—that is, the amount of nutrients applied to the golf course does not exceed the capacity of the soil and vegetation to absorb the nutrients, preventing meaningful discharge to the West Fork.

As explained in Defendants' motion for summary judgment (Docs. 72-74), Plaintiffs' claims fail as a matter of law because the undisputed evidence demonstrates there is no "point source" that could support Plaintiffs' claims under the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (1972) ("CWA").  Additional legal defects in Plaintiffs' claims are described in this response.  But if the Court determines that any part of Plaintiffs' complaint survives Defendants' motion for summary judgment, this is the quintessential case where a trial is necessary to resolve the material disputed facts underlying Plaintiffs' claims.  Specifically, Plaintiffs' Motion should be denied for three reasons.

First, there is no direct discharge from the District's storage ponds. Plaintiffs claim the District directly discharges treated effluent from the ponds to the West Fork through the underdrain pipe.  However, the storage ponds are not connected to the underdrain system, and it is undisputed that the underdrain does not convey effluent directly from the storage ponds to the West Fork.  Instead, the underdrain pipe merely transports groundwater that would end up in the West Fork even if the underdrain were not there.  The underdrain pipe does not cause the "addition" of any pollutant to the West Fork.  Accordingly, there is no CWA violation.

Second, Plaintiffs' indirect discharge theory—that the Meadow Village golf course is over-irrigated with treated effluent—fails because Defendants do not own

or operate the French drains on the golf course that Plaintiffs claim are the point sources discharging pollutants into the West Fork.  These French drains are not part of the irrigation system, and Plaintiffs do not even argue that Defendants have any control over them.  Instead, Plaintiffs argue Defendants are liable because there is a "functional equivalent of a point source."  Pls.' Br. (Doc. 77) at 14, 19. There is no such thing.  The Supreme Court's decision in *County of Maui v. Hawaii Wildlife Fund* allows for the "functional equivalent of a *direct discharge*," but requires a point source owned or operated by the defendant from which pollutants originate, and none exists here.  140 S. Ct. 1462 (2020) (emphasis added).  Even if Plaintiffs' indirect discharge theory were viable, it is based on material disputed facts concerning the District's compliance with state regulatory standards and the technical consequences of its operations.  Summary judgment is therefore unavailable to Plaintiffs.

Third, injunctive relief is neither warranted nor appropriate.  Plaintiffs have proved no violation of the CWA, and the Court must determine that a defendant is liable before considering what relief may be awarded.  Moreover, Plaintiffs' request for injunctive relief is based on the faulty premise that a discharge permit could not be obtained.  Although DEQ has determined that the District "is not required to and do[es] not currently hold a discharge permit," the District has

obtained a discharge permit in the past and could do so again if required.

Plaintiffs' Motion should be denied.

## **ARGUMENT**

## I.    **THERE IS NO DIRECT DISCHARGE IN THIS CASE.**

"To establish a violation of the CWA, 'a plaintiff must prove that defendants (1) discharged, i.e., added (2) a pollutant (3) to navigable waters (4) from (5) a point source.'" *Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1083 (9th Cir. 2019) (quoting *Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993)); *see also Cnty. of Maui*, 140 S. Ct. at 1468 ("The Clean Water Act forbids the 'addition' of any pollutant from a 'point source' to 'navigable waters' without the appropriate permit.").

Plaintiffs argue the District violated the CWA by "directly discharging 21.12 million gallons of treated sewage per year from a pipe below the holding ponds into the West Fork." Pls.' Br. at 16.  The parties' experts dispute whether the volume of treated effluent that migrates into this pipe is millions of gallons per year or a de minimis amount—a monumental difference of opinions.  SDF ¶¶ 21, 60.  Regardless, Plaintiffs identify no direct discharge to surface waters.  The "pipe" (i.e., the underdrain) is not connected to the storage ponds and does not directly discharge treated effluent from the ponds.  Accordingly, there is no "addition" of "pollutants" from the underdrain pipe because it merely carries groundwater that would otherwise reach surface waters (e.g., the West Fork) even

if the underdrain were not there.  As to these points, there is no dispute, and
Plaintiffs' direct discharge theory therefore fails.

> ### A.     The District's storage ponds are not plumbed to the underdrain.

It is undisputed that the underdrain does not convey effluent directly from
the storage ponds to the West Fork.  The underdrain is not plumbed to the storage
ponds.  Doc. 73 at ¶ 17 (Defendants' Statement of Undisputed Facts ("SUF") to
support Defendants' Motion for Summary Judgment).  Rather, the District installed
the underdrain to provide a preferential pathway for groundwater flow, lowering
the water table beneath the ponds and preventing groundwater from "floating" the
pond liners.  *Id.* ¶ 12.  A high-density polyethylene liner and layers of engineered
and native substrate separate treated effluent in the ponds from the underdrain.  *Id.*
¶ 9.  There is no component of the facility design that conveys water stored in the
ponds to the underdrain.  *Id.* ¶ 11.  Therefore, as the Court previously recognized,
"[t]he hydrology of the system at issue does not support a direct discharge theory."
Doc. 35 at 12.[1]

---

[1] The storage ponds themselves are not point sources under the CWA, primarily
because they are not "conveyances."  *See* Doc. 74 at 14-22.  Even if the Court were
to disagree, there still would be no direct discharge because any leakage from the
ponds percolates into the subsurface and not to navigable waters.  Plaintiffs do not
argue an indirect discharge theory based on pond leakage.

**B.      The underdrain pipe does not add pollutants to surface waters.**

Plaintiffs also appear to argue that the underdrain, by itself, is a point source that directly discharges to the West Fork.  Pls.' Br. at 16-17.  This theory fails because the underdrain does not result in the "addition" of any "pollutants" to the West Fork.  Rather, as explained in Defendants' summary judgment brief, it simply moves water from one part of a water body to another part of that same water body.  *See* Doc. 74 at 22-24; *see also* Doc. 35 at 11 (noting the parties' agreement that the groundwater and the West Fork are a hydrologically connected water body).

The CWA prohibits the "*addition* of any pollutant to navigable waters from any point source" without a permit.  33 U.S.C. §§ 1311(a), 1362(12) (emphasis added).  "[N]o pollutants are 'added' to a water body when water is merely transferred between different portions of that water body."  *L.A. Cnty. Flood Control Dist. v. Nat. Res. Def. Council*, 568 U.S. 78, 82 (2013).  Thus, where water would naturally migrate within a water body "absent human intervention"—such as the underdrain—there is no "addition" of pollutants.  *See S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 109-11 (2004); *see also ONRC Action v. U.S. Bureau of Reclamation*, 798 F.3d 933, 937-38 (9th Cir. 2015) (finding that waters transferred by a man-made canal system to the Klamath River are not "meaningfully distinct" from the waters of the river itself because the water would have drained to the river without the canal).

That is the case here.  The underdrain pipe conveys groundwater to the West

Fork that would naturally reach the river on its own, absent the underdrain system.

SDF ¶ 14.  Because "water is merely transferred between different portions of that

water body," *L.A. Cnty. Flood Control Dist.*, 568 U.S. at 82, there is no "addition"

of pollutants to the West Fork, and no discharge permit is required for the

underdrain pipe.

## II.    PLAINTIFFS' OVER-IRRIGATION THEORY LACKS AN ACTIONABLE POINT SOURCE, AND IS BASED ON DISPUTED FACTS IN ANY EVENT.

Plaintiffs also claim the District violated the CWA because over-irrigation of

the Meadow Village golf course is the "functional equivalent of a point source

discharge" under *Maui*.  Pls.' Br. at 18-19.  Plaintiffs misinterpret *Maui*, and their

over-irrigation theory is not legally cognizable.  Plaintiffs appear to believe *Maui*

eliminated the requirement of an originating point source, arguing the District

violated the statute due to diffuse percolation of irrigation water that eventually

migrates *to* a point source that Defendants do not own.  This is not the law.  Every

CWA violation requires the discharge to originate from a point source owned or

operated by the defendant, and Plaintiffs cannot show that here.

Assuming the Court finds a *Maui* analysis necessary—despite the lack of an

originating point source—Plaintiffs also ignore an overriding consideration under

the *Maui* "functional equivalent" analysis:  Montana already regulates the

groundwater discharges at issue here, and the parties disagree on whether the District is complying with Montana's regulation of these discharges.

If Plaintiffs' over-irrigation theory survives summary judgment, their *Maui* analysis implicates numerous disputed issues of fact that preclude summary judgment and would need to be resolved at trial.

### A.   Defendants do not own or operate the alleged golf course point sources and Plaintiffs misconstrue the *Maui* decision.

Plaintiffs identify seven French drains located throughout the Meadow Village golf course as the alleged point sources for their over-irrigation theory. *See* Pls.' Br. at 18-24.  The primary problem with Plaintiffs' theory is that Defendants do not own, operate, maintain, or otherwise control these French drains, which are not even part of the golf course irrigation system.  SUF ¶ 20.  As detailed in Defendants' summary judgment brief, ownership or control over the point source is required for CWA liability to attach.  *See* Doc. 74 at 12-14. Plaintiffs' irrigation claim thus fails at the threshold.

Because the District does not own or operate the alleged point sources on the golf course, Plaintiffs instead argue over-irrigation is "the functional equivalent of a point source requiring a discharge permit."  Pls.' Br. at 14, 19.  This is not a legally cognizable claim.  The CWA requires a permit when there is "the functional equivalent *of a direct discharge*," not the functional equivalent *of a point source.  Cnty. of Maui*, 140 S. Ct. at 1476 (emphasis in original altered).

*Maui* does not relieve Plaintiffs of their burden of identifying an actionable point source. Rather, the Supreme Court evaluated whether the CWA "requires a permit when pollutants *originate from a point source* but are conveyed to navigable waters by . . . groundwater." *Cnty. of Maui*, 140 S. Ct. at 1468 (emphasis added). The Court concluded that, where treated effluent is discharged from the point source and mixes with groundwater before entering a navigable water, the CWA would require a National Pollutant Discharge Elimination System permit "if the addition of the pollutants through groundwater is the functional equivalent of a direct discharge from *the point source* into navigable waters." *Id.* (emphasis added).

Here, there is no point source owned or operated by Defendants, so Plaintiffs' *Maui* analysis is backward. They claim that because the District supplies treated effluent to the golf course, and because "[t]he Golf Course was irrigated near" the French drains, Pls.' Br. at 13, the District is somehow responsible for eventual discharges of irrigation water from these French drains— the alleged point sources, *see id.* at 21 ("The Chapel Springs drain is a French drain at the end of the Golf Course discharging to the West Fork."). Plaintiffs then apply the *Maui* factors, concluding that migration of irrigation water from the land surface, through the subsurface and groundwater, and *then* out the French drains

amounts to "the functional equivalent of a point source requiring a discharge permit."  Pls.' Br. at 14, 19.

There is no such thing as the "functional equivalent of a point source."  In every case, the CWA requires the pollutant to originate from a point source that is owned or operated by the Defendants.  Because Plaintiffs cannot make that showing here, their "functional equivalent" analysis fails, and their Motion should be denied.

   **B.    Any *Maui* analysis should start with the District's compliance with Montana's regulation of the alleged discharges, which is disputed.**

Because Defendants do not control the alleged point sources and Plaintiffs cannot sue over the "functional equivalent of a point source," the Court need go no further.  But if any *Maui* analysis is required here, Plaintiffs ignore a critical aspect of it—the District's compliance with Montana's regulations that specifically apply to its facilities.

*Maui* provides seven factors that "may prove relevant" in evaluating whether a discharge to groundwater is functionally equivalent to a direct discharge to navigable waters.  *Cnty. of Maui*, 140 S. Ct. at 1476.  It does not, however, require courts to mechanically apply those seven factors, or any particular factors at all.  Rather, the Supreme Court left it to lower courts to "provide guidance through decisions in individual cases," with an eye toward the "underlying statutory objectives."  *Id.* at 1477.

One of the CWA's most important statutory objectives is that "as to groundwater pollution and nonpoint source pollution, Congress intended to leave substantial responsibility and autonomy to the States." *Id.* at 1471; *see also Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 550 F.3d 778, 785 (9th Cir. 2008) ("[T]he control of non-point source pollution often depends on land use controls, which are traditionally state or local in nature." (citation omitted)).  Given the statute's deference to state authority over groundwater, trial courts' decisions on functional equivalence should "preserve state regulation of groundwater and other nonpoint sources of pollution." *Cnty. of Maui*, 140 S. Ct. at 1476.

Montana regulates groundwater quality under the Montana Water Quality Act, Mont. Code Ann. § 75-5-101 *et seq.*, and its implementing regulations, Mont. Admin. R. § 17.30.101 *et seq.*  Under Montana's groundwater quality permitting regulations, Mont. Admin. R. § 17.30.1001 *et seq.*, DEQ requires an owner or operator of a facility "which may discharge pollutants into state ground waters" to obtain a Montana Groundwater Pollution Control System permit.  *Id.* § 17.30.1023(3).  Unlike the federal CWA, Montana's permitting regime extends DEQ's authority to "drainage or seepage" from "artificial, privately owned ponds or lagoons," where such seepage could pollute groundwater.  Mont. Code Ann. § 75-5-104.  However, DEQ's regulations also expressly exempt from the permitting requirements any "public sewage systems that apply reclaimed wastewater at

agronomic rates to land as a method of disposal and that have been reviewed and approved by the department under Title 75, chapter 6, and ARM 17.38.101." Mont. Admin. R. § 17.30.1022(1)(g).

DEQ's Rule 30(b)(6) witness confirmed these regulatory standards apply to the District's Water Resources Recovery Facility ("WRRF"). Under Montana Administrative Rules section 17.30.1022(1)(g), DEQ does not require the District to obtain a discharge permit for disposal of treated effluent if irrigation is within the agronomic limits of the golf course turfgrass. *See* Doc. 73-3 at 53:21-54:12; *id.* at 56:23-57:11; *see also* SDF ¶ 76. Similarly, DEQ does not require a discharge permit for the District's storage ponds so long as the pond liners leak less than six inches per year. SUF ¶ 10; Doc. 73-3 at 74:3-76:11.

The District's compliance with these state groundwater standards implicates disputed issues of fact. The parties dispute whether the golf course is over-irrigated. The DEQ-approved plan allows the District to supply up to 108 pounds per acre per year of nitrogen via reclaimed wastewater used for irrigation. *See* Doc. 22-1 at 11. Plaintiffs' expert calculated that irrigation water added nitrogen to the golf course at a rate of 289 pounds per acre per year in 2020. SDF ¶ 75. In contrast, Defendants' expert calculated a rate of 106 pounds per acre per year in 2020. SDF ¶ 76.

The parties also disagree about the rate at which any effluent leaks from the District's storage ponds.  Plaintiffs' expert asserts that more than 20 million gallons of effluent leak through the pond liners each year, but Defendants' expert determined leakage to be a de minimis amount.  SDF ¶¶ 21, 60.

If Plaintiffs' over-irrigation claim proceeds, these factual issues must be resolved at trial to determine whether the District is required to obtain a discharge permit.  If the District is complying with state regulatory standards such that DEQ will not require a permit, but the Court nonetheless required the District to obtain a permit, the District would be left in a peculiar position—it would need to obtain a surface water discharge permit from DEQ for the eventual fate of a groundwater discharge that DEQ expressly exempts from permitting.  This outcome would undermine Montana's regulation of state groundwater—and, importantly, *Maui*'s recognition of State primacy over groundwater regulation under the CWA.  If the Court resolves these issues in the District's favor, no CWA violation should be found.

C.     **Consideration of the *Maui* factors implicates numerous disputed issues of material fact.**

As discussed in Sections II.A and II.B, above, the Court need not consider the *Maui* factors in this case.  Plaintiffs have not argued any pollutant is discharged from an originating point source owned or operated by Defendants before it allegedly reaches surface water through groundwater, precluding consideration of

- 13 -

whether the discharge is the "functional equivalent" of a discharge from a point source to a navigable water.  If, however, the Court determines an analysis of the factors enumerated in *Maui* is warranted, summary judgment is not appropriate because these are highly factual and technical issues about which the parties' experts have reached opposite conclusions.  Faced with such a "battle of the experts," the Court cannot grant summary judgment.

**Factors 1 and 2.**  Plaintiffs claim there is virtually no distance for nitrogen in the groundwater to travel before reaching the West Fork, relying primarily on a Ph.D thesis written by Kristin Gardner and a Technical Memorandum written by Chris Allen.  Pls.' Br. at 19-20.  The thesis and Technical Memorandum are inadmissible and should not be considered by the Court.[2]  Regardless, although Plaintiffs argue that transit time is the most important factor, Pls.' Br. at 19, they fail to provide any evidence of the time it takes nitrogen applied to the golf course to reach the West Fork.  They simply argue that it takes less time for nitrogen applied to the golf course to reach the river than nitrogen from leaking septic systems further upgradient.  *Id.*  This is irrelevant to the analysis.

---

[2] Ms. Gardner and Mr. Allen are third parties, neither of whom has been retained or disclosed as an expert in this case.  Their opinions based on their respective technical, scientific, and specialized knowledge are thus not admissible.  Fed. R. Evid. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: . . . (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.").

The parties dispute whether any significant amount of nitrogen from irrigation gets to groundwater in the first place, and whether or when such nitrogen would get to the river through groundwater given the travel time and distance. Doc. 26-7 ¶ 6 (describing Mr. Cunnane's analysis that most of the nitrogen in the irrigation water is consumed by the golf course grass); SDF ¶ 76 (describing Mr. Buecker's calculation that the amount of nitrogen applied for irrigation in 2020 was below the amount authorized by DEQ).

**Factors 3, 5, and 6.**[3]  For each of these factors, Plaintiffs base their argument on irrigation water reaching the West Fork through the Golf Course/Chapel Springs drain.  Pls.' Br. at 21-23.  As explained above, the Chapel Springs or Golf Course drain is a French drain that the owner of the golf course (Boyne) owns, operates, and maintains to prevent puddling and to maintain the playability of the golf course.  The drain is not a component of the irrigation system.  The CWA does not impose liability on the District for any potential discharges from the Golf Course drain because the District does not own, control,

---

[3] Factor 3 is the nature of material through which the pollutant travels; Factor 5 is the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source; and Factor 6 is the manner by or area in which the pollutant enters the navigable waters.

or operate the drain—and accordingly does not have the right to plug, divert, or remove this drain.  SUF ¶¶ 20-21.

Moreover, the opinions of Defendants' expert rebut Plaintiffs' arguments. As to Factor 3, Mr. Cunnane has explained "there is significant clay and organic matter in the soils beneath the golf course, providing high water retention and ion exchange capacity.  As a cation molecule, ammonia is strongly adsorbed to soil through ion exchange processes." Doc. 48-2 at 19.  As to Factor 5, Mr. Cunnane performed a mass loading analysis, which compared the nitrogen load applied to land from golf course irrigation to the total nitrogen load to the West Fork in the relevant segment of the river.  He concluded that any amount of nitrogen that reaches the river from irrigation is a small fraction of the total amount applied through irrigation.  *See* Doc. 48-2 at 24.  Finally, Defendants' sampling showed that the average nitrate concentration of irrigation water was approximately 0.4 mg N/L, while the average concentration sampled from the Golf Course Drain was 5.8 mg N/L.  Doc. 53-2 ¶ 15. These data reflect an influx of nitrogen from multiple other sources upgradient of the golf course.  *See* Doc. 48-2 at 24, 26.  Plaintiffs cannot obtain summary judgment on this record.

**Factors 4 and 7.**[4]   Mr. Cunnane disagrees with Plaintiffs' characterization of the amount of nitrogen from irrigation that reaches the West Fork, explaining that agronomic uptake by golf course grass dramatically reduces nitrogen concentrations before eventual discharge to the West Fork.  Doc. 53-2 at ¶ 13. Nitrogen not consumed by grass undergoes chemical dilution and transformation in the subsurface.  Doc. 48-2 at 21; Doc. 76-5 at 14.  Data collected from groundwater drains on the golf course show that "immediately down-gradient of the irrigated area, the groundwater does not have the same water chemistry as the irrigation source water."  Doc. 48-2 at 21.  Thus, contrary to Plaintiffs' claims, Defendants' experts have opined that nitrogen in irrigation water is diluted and chemically changed and has materially changed its specific identity before reaching the West Fork.

The foregoing review of the *Maui* factors demonstrates that Plaintiffs' indirect discharge theory implicates numerous disputed issues of material fact and diametrically opposed expert opinions.  If any of Plaintiffs' claims survive Defendants' summary judgment motion, the Court must resolve these factual disputes at trial.  Plaintiffs' motion for summary judgment should be denied.

---

[4] Factor 4 is the extent to which the pollutant is diluted or chemically changed as it travels; Factor 7 is the degree to which the pollution (at that point) has maintained its specific identity.

III.   **INJUNCTIVE RELIEF IS NOT APPROPRIATE.**

Plaintiffs ask the Court to permanently enjoin the District: (1) from accepting new sewer connections; and (2) from supplying the golf course with treated effluent that contains nitrogen concentrations greater than 15 mg/L.  Doc. 75 at 2.[5]  Injunctive relief is not warranted in this case, and certainly not on the record before the Court.

Primarily, Plaintiffs are not entitled to any relief because their claims fail as a matter of law.  *See* Docs. 72-74.  Even if some portion of Plaintiffs' claims survives Defendants' motion for summary judgment, there remain significant factual and legal disputes as to whether Defendants have violated the CWA.  Finally, Plaintiffs' request for injunctive relief is premised on their incorrect belief that the District cannot apply for a discharge permit.

A.   **Defendants have not violated the CWA, which precludes injunctive relief.**

Before the Court considers what relief could be awarded, Plaintiffs must first prove Defendants' liability.  But Defendants have demonstrated in their own motion for summary judgment that Plaintiffs' claims fail as a matter of law based on the undisputed facts.  As explained in Defendants' brief, Plaintiffs have not

---

[5] Plaintiffs also ask the Court to direct the parties to brief the issue of appropriate remediation and penalties.  Doc. 75 at 2.  However, Plaintiffs did not plead penalties and are not entitled to them.  *See* Doc. 74 at 25-27.

identified an actionable point source that would support their claims because: (1) Defendants do not own or control the Meadow Village golf course or any alleged point source located on the golf course, including the Golf Course drain or any other French drain; (2) the District's storage ponds are not a "point source" under the CWA because they are not a "conveyance" of pollutants and any leakage from the ponds is diffuse; and (3) the underdrain pipe does not cause the "addition" of pollutants because it merely moves groundwater that would otherwise reach the West Fork through natural groundwater flow.  *See* Doc. 74 at 11-24.  Because there has been no CWA violation, the Court should not award any relief.

If Plaintiffs' claims are not completely barred as a matter of law, then genuine issues of material fact still preclude summary judgment in Plaintiffs' favor, which makes consideration of relief premature.  At a minimum, there are genuine fact disputes concerning whether any of Defendants' operations can be considered the "functional equivalent of a direct discharge," and specifically concerning Defendants' compliance with Montana's regulation of the facilities and discharges at issue, and whatever other factors the Court considers germane to a "functional equivalent" analysis in this case.  *See* Sections II.B and II.C, *supra*.

**B.    The District could apply for a discharge permit.**

Plaintiffs argue that because "environmental injury is sufficiently likely and the District cannot apply for a discharge permit, the balance of harms favors an injunction to protect the West Fork."  Pls.' Br. at 28.  This argument is based on a

faulty premise.  Any discharge permit the District might obtain in the future would be to the main stem of the Gallatin River, not the West Fork.  The District previously held a Montana Pollution Discharge Elimination System ("MPDES") permit allowing the District to discharge to the Gallatin River.  SDF ¶ 87 (citing Fourth Declaration of Ron Edwards ¶ 6).  The District could apply for such a permit again, if necessary.

On January 15, 1999, DEQ issued the District an Authorization to Discharge under the MPDES, Permit No. MT0030384.  *Id.* ¶ 88.  The permit authorized the District to discharge "from its **domestic wastewater treatment facilities** to receiving waters named **Gallatin River**." *Id.* (bold in original).  The original permit was effective from April 1, 1999, and expired on September 30, 2003.  *Id.*

At the time the discharge permit was issued, the District intended to construct a mile-long pipeline from the WRRF to the Gallatin River and discharge treated effluent from the WRRF to the Gallatin River.  *Id.* ¶ 89.  The District's discharge permit was subsequently extended, and the District submitted a permit renewal application.  *Id.* ¶ 90.

In November 2010, DEQ terminated the permit at the District's request because: (1) the discharge structure to the Gallatin River had never been constructed and a direct discharge had never occurred from the WRRF; and (2) wastewater from the WRRF is applied to the Meadow Village golf course "in

accordance with review provided by the Department's Technical and Financial Assurance Bureau." *Id*. ¶ 91.  DEQ notified the District that if it planned to "reactivate a discharge to state waters from the Big Sky Wastewater Treatment Plant, [the District] must complete an appropriate MPDES application." *Id.* ¶ 92. The District has not renewed the permit because all of the effluent from the WRRF is used for irrigation—none is discharged to surface waters.  DEQ agrees, recognizing that the District follows a "zero-liquid discharge approach," and concluding that the District "is not required to and do[es] not currently hold a discharge permit."  SUF ¶ 8.

If the Court were to conclude that the District requires a discharge permit for any of its operations, the remedy would be for the District to apply for and obtain such a discharge permit from DEQ—not to enjoin the District's operations.  This is the injunctive relief Plaintiffs requested in their complaint, Doc. 8 at 12.B, and it is the only injunctive relief they can seek in this case.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion should be denied.

DATED this 12th day of November, 2021.

/s/ Jacqueline R. Papez
Jacqueline R. Papez
Cynthia D. Brooks
DONEY CROWLEY P.C.


/s/ Jonathan W. Rauchway
Jonathan W. Rauchway
DAVIS GRAHAM & STUBBS LLP

*Attorneys for Defendants*

## CERTIFICATION OF COMPLIANCE

The undersigned certifies that the foregoing document complies with Local Rule 7.1(d)(2). The Brief contains 4,680 words, excluding the caption, table of contents, table of authorities, certificate of compliance, and certificate of service. The undersigned relied on the word count of the word-processing system used to prepare the brief.

/s/ Jonathan W. Rauchway

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 12th day of November, 2021, a true and correct copy of the foregoing **DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND INJUNCTIVE RELIEF** was filed and served via ECF on the following parties:

John Meyer
P.O. Box 412
Bozeman, MT 59771
(406)546-0149
john@cottonwoodlaw.org

*Counsel for Plaintiffs*

*/s/ Jonathan W. Rauchway*