Jacqueline R. Papez
Cynthia D. Brooks
DONEY CROWLEY P.C.
P.O. Box 1185
50 South Last Chance Gulch, 3rd Floor
Helena, MT 59601
Telephone: (406) 443-2211
Facsimile:  (406) 449-8443
jpapez@doneylaw.com
cbrooks@doneylaw.com

Jonathan W. Rauchway (*Admitted Pro Hac Vice*)
Mave A. Gasaway (*Admitted Pro Hac Vice*)
Andrea M. Bronson (*Admitted Pro Hac Vice*)
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, CO 80202
Telephone:  (303) 892-9400
Facsimile:   (303) 893-1379
jon.rauchway@dgslaw.com
mave.gasaway@dgslaw.com

*Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MONTANA - BUTTE DIVISION

| | |
|---|---|
| COTTONWOOD ENVIRONMENTAL LAW CENTER, et al., | ) ) ) |
| | ) Case No. 2:20-cv-00028-BMM |
| *Plaintiffs,* | ) |
| vs. | ) DEFENDANTS' STATEMENT OF |
| | ) DISPUTED FACTS |
| RON EDWARDS, in his official capacity as Manager of the Big Sky Water and Sewer District; and BIG SKY WATER AND SEWER DISTRICT, | ) ) ) ) ) |
| | ) |
| *Defendants.* | ) |

Pursuant to Local Rule 56.1(b), Defendants Big Sky County Water and Sewer District No 363 (the "District") and Ron Edwards, in his official capacity (collectively, "Defendants"), submit this Statement of Disputed Facts in opposition to the Motion for Summary Judgment and Injunctive Relief ("Motion") filed by Plaintiffs Cottonwood Environmental Law Center, Montana Rivers, and Gallatin Wildlife Association (collectively "Plaintiffs").

**Verbatim Response to Plaintiffs' Statement of Undisputed Facts (Doc. 76)[1]:**

1.      The West Fork flows alongside the Big Sky Water Resources Recovery Facility ("WRRF") and the treated effluent holding ponds.

   a.      Doc. 35 at 6.

*Undisputed.*

2.      The West Fork of the Gallatin River is a navigable water.

   a.      Doc. 35 at 6.

*Undisputed.*

3.      Defendants discharge treated sewage from a pipe below the effluent holding ponds into the West Fork of the Gallatin River.

   a.      Doc. 35 at 6

---

[1] Plaintiffs' Statement of Undisputed Facts is misnumbered as there are two No. 2s and two No. 3s. Defendants do not repeat the misnumbering, but restate each paragraph in order in this Statement of Disputed Facts.

b.      Exhibit 1 at 29:3-4 (Cunnane Depo.).

*Disputed.  The sources cited by Plaintiffs do not support this statement.  In its Order denying Plaintiffs' Motion for Preliminary Injunction, the Court did not find Defendants discharge treated sewage from a pipe below the effluent holding ponds into the West Fork of the Gallatin River, but merely recited the Plaintiffs' allegations.  Doc. 35 at 6.[2]  Mr. Cunnane testified: "There's a pipe connected to the underdrain system that discharges groundwater."  Plaintiffs' Exhibit 1 (Doc. 76-1) at 29:3-4.  The storage ponds are not directly connected to the underdrain system.  There is no component of the facility design that conveys water stored in the ponds to the underdrain.  Doc. 53-2 ¶ 11.*

4.      The West Fork flows through the Meadow Village Golf Course.

a.      Doc. 14 at 4.

*Undisputed.*

5.      In 2010, the Montana Department of Environmental Quality ("DEQ") placed the West Fork on its CWA Section 303(d) list of water quality impaired streams.

a.      Doc. 35 at 6

b.      Doc. 23-3 at 76

---

[2] Defendants cite to ECF page numbers for all docket documents except depositions, for which Defendants cite the original pagination.

*Disputed with respect to the date.  The relevant 303(d) List was issued in 2008.  Otherwise, undisputed, but immaterial to the determination of Plaintiffs' Motion.*

6.      To address the water quality issue, in 2010, DEQ published a Total Maximum Daily Load ("TMDL") and corresponding water quality improvement plan to clarify the maximum amount of nitrogen the West Fork could receive while still meeting state water quality standards.

      a.      Doc. 35 at 6

      b.      Doc. 23-3 at 76–79

*Undisputed that DEQ published the report titled* West Fork Gallatin River Watershed Total Maximum Daily Loads (TMDLs) and Framework Watershed Water Quality Improvement Plan *(TMDL Report) in 2010, but immaterial to the determination of Plaintiffs' Motion.  The TMDL Report was based on data from the mid-2000s that is now approximately 15 years old, and Defendants dispute the applicability and relevance of any findings included in the TMDL report.*

7.      A TMDL is a pollution budget for a water body identifying the maximum amount of pollutant a water body can assimilate without exceeding applicable Water Quality Standards.

      a.      Doc. 23-3 at 229-230.

*Undisputed that the TMDL Report states: "A TMDL is a pollutant budget for a water body identifying the maximum amount of the pollutant that a water body can assimilate without causing applicable WQS to be exceeded," Doc. 23-3 at 228, but this statement is immaterial to the determination of Plaintiffs' Motion. Defendants dispute the applicability and relevance of any findings included in the TMDL Report.*

8.    A TMDL is the sum of Wasteload Allocations (point sources), Load Allocation (nonpoint sources), and Margin of Safety.

a.    Doc. 23-3 at 229-30.

*Undisputed that the TMDL Report states: "TMDLs must account for loads/impacts from point and nonpoint sources in addition to natural background sources and must incorporate a margin of safety and consider influences of seasonality on analysis and compliance with WQS," Doc 23-3 at 228-29, but this statement is immaterial to the determination of Plaintiffs' Motion. Defendants dispute the applicability and relevance of any findings included in the TMDL Report.*

9.    The West Fork's TMDL notes that golf course irrigation is not included for load allocation purposes.

a.    Doc. 23-3 at 110.

*Undisputed but immaterial to the determination of Plaintiffs' Motion.*

*Defendants dispute the applicability and relevance of any findings included in the*

*TMDL Report.*

10.     DEQ observed that nitrogen levels in the West Fork already exceed

maximum quantity, and that nitrogen originates from sources including "improper

management of land-applied effluent."

      a.      Doc. 35 at 6

      b.      Doc. 23-3 at 83–86

*Undisputed that based on data from the mid-2000s, DEQ stated in the*

*TMDL Report that "Anthropogenic nutrient sources within the reach are believed*

*to consist of a variety of variable sources and include nutrients derived from" a*

*number of listed sources, but immaterial to the determination of Plaintiffs' Motion.*

*Disputed that the District engages in "improper management of land-applied*

*effluent."*

11.     Groundwater naturally sits in aquifers beneath the District's lined

holding ponds.

      a.      Doc. 35 at 5.

*Undisputed.*

12.     If the groundwater level rises too high, the groundwater would "float"

the holding pond liners, leading to effluent spillover from the holding ponds.

6

a.      Doc. 35 at 5-6.

*Undisputed.*

13.     The District diverts the groundwater under its holding ponds into the West Fork of the Gallatin River using an underdrain pipe system to prevent such spillover.

a.      Doc. 35 at 6

b.      Exhibit 1 at 29:3-4 (Cunnane Depo.).

*Undisputed that the underdrain pipe drains to a wetland that drains to the West Fork.*

14.     The District has previously represented to this Court that its "underdrain system merely conveys groundwater to the West Fork that would naturally reach the river on its own."

a.      Doc. 53 at 17.

*Undisputed.*

15.     Plaintiffs retained Tom Aley of Ozark Underground Lab to test the holding ponds for leaks.

a.      Exhibit 2 (Aley Depo.)

*Undisputed that the Plaintiffs retained Tom Aley as an expert witness in this case, but immaterial to the determination of Plaintiffs' Motion.*

16.     Mr. Aley has completed thousands of dye tracer tests over the last forty years, wrote a chapter in a textbook taught at Carroll College regarding flouroscein dye testing, published over 100 articles, and co-authored an article with the United States Environmental Protection Agency ("EPA") about the use of flouroscein dye tracing.

     a.     Exhibit 2 at 17: 20-22 (Aley Deposition)

     b.     Exhibit 3 (Aley Final Report).

*Undisputed, but immaterial that Mr. Aley has described his background as stated.  Defendants dispute the validity of Mr. Aley's methodology used in this case and dispute that his opinions are reliable or accurate.*

17.     Flouroscein dye was placed in the holding ponds under Mr. Aley's supervision.

     a.     Exhibit 3.

*Undisputed.*

18.     Dye was found both in the water being discharged from the underdrain pipe and at sampling sites along the West Fork

     a.     Exhibit 2.

*Undisputed that dye was found in water from the underdrain pipe and at certain other sampling sites.  Disputed that this shows any introduction of nitrogen.  Mr. Aley completed a presence/absence test to determine if dye reached*

*the West Fork Gallatin River.  This test can only determine presence/absence of dye.  It does not equate to a nitrogen discharge to the West Fork Gallatin River. Mr. Aley did not design his dye test to determine leakage rates from storage ponds or infiltration rates of irrigation water.  Doc. 76-5 at 13.*

19.     The Defendants were provided with half of the samples that Plaintiffs collected.

      a.     Exhibit 5 at 9.

*Undisputed, but immaterial to the determination of Plaintiffs' Motion.*

20.     The lab that the Defendants used to analyze the samples confirmed that dye was found at the underdrain sampling site and throughout the West Fork.

      a.     Exhibit 5, Attachment B.

*Disputed as stated.  The lab Defendants used found positive results from water discharging from the underdrain, and questionable positive results in the underdrain runoff and underdrain stream.  Most testing locations on the West Fork were non-detect for dye.  See Doc. 76-5, Att. B.  The lab did not "confirm dye was found" "throughout the West Fork."*

21.     Mr. Aley determined 21.12 million gallons of treated sewage from the holding ponds are being discharged from the underdrain pipe into the West Fork annually.

      a.     Exhibit 2 at 4-5.

*Disputed.  Mr. Aley's opinions are not undisputed facts and have been rebutted by Defendants' expert, Mark Cunnane.  See Doc. 48-2 at 12; compare Doc. 76-2 at 5-7 with Doc. 76-5 at 13-14.*

22.    The District and DEQ developed a Nutrient Management Plan ("NMP") governing irrigation of the Golf Course to ensure turf grass and plants along the course take up any nitrogen delivered through irrigation.

   a.    Doc. 35 at 5.

*Undisputed.  The NMP is a set of guidelines that the District developed at DEQ's request and under DEQ's supervision.  DEQ has never asserted that the District failed to comply with any of the NMP's terms or requirements.  Doc. 53-1 at ¶ 9.*

23.    Per the NMP, "[w]hile nitrogen is vital for turf growth, over application can result in leaching of nitrogen into the groundwater and potentially result in nitrogen reaching the Middle Fork West Fork Gallatin River."

   a.    Doc. 22-1 at 6.

*Undisputed that the NMP contains this statement.  Disputed that there has been overapplication of nitrogen at the Meadow Village golf course.*

24.    Boyne U.S.A., Inc. ("Boyne"), the Golf Course owner and operator, is not a party to the NMP.

   a.    Doc. 35 at 5.

*Undisputed.*

25.    Rather, the District solely controls the quality, quantity, and timing of effluent used in irrigation in compliance with the NMP.

      a.    Doc. 35 at 5.

*Undisputed that the District controls effluent water quality through treatment of the water and controls the quantity of effluent supplied to the golf course and the timing of when the irrigation seasons begins and ends each year because it pressurizes and depressurizes the system that supplies irrigation water to the golf course.*

*The golf course owner solely controls when to irrigate the course, where to irrigate the golf course, and how much to irrigate specific areas of the course, on any specific day or time within the irrigation season.  The golf course owner controls the irrigation system and drains located on the golf course.  DEQ has never found the District to be out of compliance with the NMP.  Doc. 26-1 at ¶¶ 12, 16.*

26.    The District tracks compliance with the NMP through its operation of lysimeters to monitor nutrient levels on the Golf Course.

      a.    Doc. 35 at 5

*Undisputed but incomplete, and also immaterial.  The District tracks compliance with the NMP through numerous metrics, including lab testing of irrigation water.*

27.     The District maintains seven lysimeters throughout the Golf Course.

   a.     Doc. 22-1 at 14.

*Undisputed but immaterial.*

28.     The NMP requires that the District collect and test for Total Nitrogen and Nitrates every two weeks or whenever water is present in the lysimeters.

   a.     Doc. 22-1 at 16.

*Disputed.  The NMP contains a "recommended monitoring schedule for lysimeters and monitoring wells," not a requirement.  Doc. 22-1 at 15.  The NMP also does not contain the word "or" that is included in the Plaintiffs' statement.  The NMP recommends the District test total nitrogen, nitrate, and chloride "[e]very two weeks when water is present in the lysimeter," not every two weeks* <u>*or*</u> *whenever water is present.  Doc 22-1 at 16, Table 4-2.*

29.     Defendant Edwards stated during his deposition that lysimeters were tested every time there is water to be sampled.

   a.     Doc. 48-1 at 27:13-17.

*Undisputed; this statement is on page 26 of the deposition transcript, however, not page 27.*

30.     Water has been present in each lysimeter every time they were monitored since monitoring began in 2013.

    a.     Doc. 48-4.

*Disputed.  The lysimeters are predominantly dry, although Lysimeter 4 typically has some water in it.  Lysimeter 4 sits in a low lying area; the others being dry shows that there is not excessive irrigation.  See Doc. 48-1 at 26:2-27:10.*

31.     Water from each lysimeter was not tested for nitrogen every time it was found.

    a.     Doc. 48-4.

*Disputed.  Mr. Edwards testified that the District's wastewater superintendent samples lysimeters weekly if there is water to be sampled, and that nitrogen is one of the parameters that is tested for.  Doc. 48-1 at 25:5-26:18.*

32.     The District's expert report states lysimeters were not tested because of a lack of water.

    a.     Exhibit 5 at 7.

*Disputed as stated.  Mr. Cunnane's rebuttal report states: "The lysimeters are sampled regularly, however, many of the lysimeters may not have enough water for sampling.  Water sampling data collected in June 2020 measured 5.38*

*mg N/L total nitrogen in Lysimeter #4. No samples were collected from other lysimeters due to insufficient water in the lysimeter reservoirs." Doc. 76-5 at 11.*

33.    Lysimeter 4 was tested when it had 2.82 inches of water.

   a.    Doc. 29-4.

*Undisputed that this lysimeter tracking table appears to show that Lysimeter 4 was sampled on June 18, 2020 when there was reportedly 2.82 inches in the lysimeter. However, lysimeter sampling is immaterial to the determination of Plaintiffs' Motion.*

34.    Lysimeter 1 was not tested when it had 2.82 inches of water.

   a.    Doc. 29-4.

*Undisputed that this lysimeter tracking table appears to show that Lysimeter 1 was not sampled on June 27, 2019, when there was reportedly 2.82 inches in the lysimeter. Lysimeter sampling is immaterial to the determination of Plaintiffs' Motion. The lysimeters are set only partially through the root zone at a depth of two-feet, and additional nitrogen uptake by plants can occur below the depth of the lysimeters. Doc. 76-5 at 12.*

35.    When samples were taken, test results show nitrogen in concentrations far above the amount found in the West Fork.

   a.    Doc. 29-4.

*Disputed as to the breadth of the statement and any implication that lysimeter data shows significant nitrogen is migrating from irrigation to the West Fork, and also immaterial to the determination of the Plaintiffs' Motion. The nitrogen concentrations in the lysimeter sampling reflect combined inputs from fertilizer, grass clippings, irrigation water, and other sources. The lysimeters are also set only partially through the root zone at a depth of two-feet, and additional nitrogen uptake by plants can occur below the depths of the lysimeters. Doc. 76-5 at 12.*

36.     The Golf Course contains a French drain known as the Chapel Springs drain that contains a perforated pipe to remove water from the Golf Course.

    a.     Exhibit 4 at 69: 1-12.

*Undisputed that the owner of the golf course owns and maintains the French drain known as the Chapel Springs drain, aka Golf Course drain. These French drains were installed by the golf course owner to prevent water from puddling on the course. Doc. 73-1 at ¶ 5.*

37.     Dye was found in the Chapel Springs drain.

    a.     Exhibit 3 at 21.

*Disputed. Plaintiffs' expert measured dye on charcoal samples in the Chapel Spring discharge. Water samples from this location were non-detect for the dye. Doc. 76-5 at 14.*

38.    According to Defendants' expert report, the Chapel Springs drain directly discharges approximately 40 gallons of ground water per minute into the West Fork.

    a.    Doc. 48-2 at 26.

*Undisputed that Mr. Cunnane estimated that the Chapel Spring drain (Golf Course Drain) discharges approximately 40 gpm based on information available at the time of his report.*

39.    The Chapel Springs drain discharges nitrates with a concentration of 5.6 mg/l.

    a.    Doc. 48-2 at 26.

*Undisputed that Mr. Cunnane estimated that the Chapel Spring drain (Golf Course Drain) discharge contains a mean value of 5.65 mg/l of nitrogen based on information available at the time of his report.  Disputed that this concentration estimate is constant.  This statement is also immaterial to the determination of Plaintiffs' Motion.*

40.    Defendants' lab did not analyze how many gallons of wastewater were being discharged from the underdrain pipe.

    a.    Exhibit 1 at 41:10-12 (Cunnane Depo).

*Disputed.  The sources cited by Plaintiffs do not support this statement. With respect to Crawford Labs, the independent lab Defendants used to analyze*

*the dye tracer results (Plaintiffs' expert used his own lab, not an independent lab), Mr. Cunnane testified that Crawford Labs did not determine the District's storage ponds were leaking.  Doc. 76-1 at 40:12-14.*

41.     Mark Cunnane, Defendants' retained expert, is not a fluorescein dye testing expert.

   a.     Exhibit 1 at 40:10-11.

*Undisputed that Mr. Cunnane is not a "fluorescein dye testing expert," but disputed that this is relevant to Mr. Cunnane's opinions in this case.  Mr. Cunnane has a bachelor's degree in geology, a master's degree in environmental engineering, is a licensed professional engineer in Montana, and is a licensed professional geologist in neighboring states (Montana does not license geology). He has been employed as a professional hydrogeologist since 1987.  Doc. 48-2 at 28.  Mr. Cunnane is an expert in groundwater and hydrogeology and is qualified to provide opinions concerning movement of constituents – including dye – through groundwater, regardless of whether he categorizes himself as a "fluorescein dye testing expert."  This statement is also immaterial to the determination of Plaintiffs' Motion.*

42.     The discharged groundwater at the Chapel Springs drain contains nitrogen at a concentration of 5.6 mg/l.

   a.     Doc. 48-2 at 26.

17

*Undisputed that Mr. Cunnane estimated that the Chapel Spring drain (Golf Course Drain) discharge contains a mean value of 5.65 mg/l of nitrogen based on information available at the time of his report.  Disputed that this concentration estimate is constant; the statement is also immaterial.  This statement repeats the statement contained in paragraph 39, above.*

43.   Defendants' expert acknowledged that nitrogen is reaching the West Fork because of over-irrigation.

   a.   Exhibit 1 at 59: 4-11 (Cunnane Depo).

*Disputed as to the characterization of Mr. Cunnane's testimony.  Mr. Cunnane did not testify that there was "over-irrigation" of the golf course.  Doc. 76-1 at 4-11.*

44.   The Chapel Springs drain discharges groundwater into the West Fork containing nitrogen at a concentration of 5.6 mg/l.

   a.   Doc. 48-2 at 26.

*Undisputed that Mr. Cunnane estimated that the Chapel Spring drain (Golf Course Drain) discharge contains a mean value of 5.65 mg/l of nitrogen based on information available at the time of his report.  Disputed that this concentration estimate is constant; this statement is also immaterial.  This paragraph repeats the statement contained in paragraph 39 and paragraph 42, above.*

45.     Defendants' expert report indicates that nitrogen is only found in the

Chapel Springs drain during times when the Golf Course is irrigated.

        a.      Doc. 48-2 at 23 (figure 13).

*Disputed.  The source cited by Plaintiffs does not support this statement.*

*Figure 13D ("Irrigation Area BSWSD Nitrogen Data Plots") shows water samples*

*from the Golf Course drain as high as 6 mg/L of nitrogen at times when the golf*

*course is not being irrigated.  Doc. 48-2 at 23, Figure 13D.*

46.     Nitrogen generally enters and accumulates in groundwater as nitrate

regardless of original nitrogen source.

        a.      Doc. 48-9 at 18.

*Disputed because this statement is a technical opinion from an inadmissible*

*report prepared by a third party who the Plaintiffs have not designated as an*

*expert in this case.  Specifically, Doc. 48-9 is a Technical Memorandum regarding*

*"Preliminary Estimate of Nutrient Loading and Potential Mitigation Projects"*

*prepared by Mr. Chris Allen, a scientist who works for WGM Group, Inc., and*

*prepared the report in that capacity – i.e., not as a retained or non-retained expert*

*in this case.  Because Mr. Allen is not a disclosed expert pursuant to Rule 26(a)(2),*

*any scientific and technical opinions he may have are not admissible.  See Fed. R.*

*Evid. 701.*

47.   The WRRF produced treated effluent containing total nitrogen below 10 mg/l in the past.

   a.   Doc. 22-1 at 11.

*Undisputed; disputed that there is any regulatory requirement that the WRRF consistently produce treated effluent containing total nitrogen below 10 mg/l.*

48.   In 2020, DEQ stated the District's treatment system is being "pushed past the design capacity."

   a.   Doc. 23 at 1.

*Undisputed but immaterial. DEQ also stated that the existing WRRF "has met the District's needs to date." The District is in the process of constructing a new WRRF, which precipitated DEQ's Environmental Assessment where the quoted statement was made. Doc. 23-1 at 3.*

49.   DEQ determined the existing treatment system "does not consistently allow the District to produce reclaimed effluent of the quality needed."

   a.   Doc. 23-1 at 2.

*Undisputed but incomplete in an apparent attempt to mislead the Court. DEQ determined that "existing treatment facility is at capacity and does not consistently allow the District to produce reclaimed effluent of the quality needed for reuse activities under consideration." Doc. 23-1 at 2.*

50.    DEQ has stated the elevated nitrogen levels "pose a surface water risk."

 a. Doc. 23-1 at 4.

*Undisputed.*

51.    Excess nitrogen causes algae blooms in rivers and streams that can harm aquatic animal and plant life.

 a. Doc. 35 at 5.

*Undisputed as a generality, but disputed that the District's operations are the cause of excess nitrogen or algae blooms in the West Fork.*

52.    Big Sky Expert Mr. Buecker answered the following question "no" during his deposition:

> Q: Should new sewers be connected to the treatment
> plant if the effluent cannot be disposed of in a way that
> results in zero discharge to the surface water?

 a. Exhibit 7 at 19: 6-11.

*Undisputed that Mr. Buecker responded as stated to a vague question the Defendants objected to, but immaterial to the determination of Plaintiffs' Motion. Mr. Buecker's response was that the District cannot operate by discharging to surface water without a permit. DEQ has recognized that the District operates a "'zero-liquid discharge' approach." Doc. 73-3 at 56:23-57:11. The District has*

*never claimed it can directly discharge to surface water without a discharge*

*permit from DEQ, and it does not do so.*

53.     Golf Course personnel decide how much to irrigate the Golf Course.

        a.      Doc. 48-1 at 17-18: 22-25, 1-3.

*Undisputed.*

54.     Golf Course personnel do not know how much nitrogen is in the

effluent when it irrigates.

        a.      Doc. 48-1 at 20:15-17.

*Undisputed that to the best of the District's knowledge, golf course*

*personnel do not know the nitrogen content in the irrigation water for every given*

*application of irrigation water.  However, the District tracks nitrogen levels in the*

*effluent to ensure compliance with the NMP.  The District complies with the NMP,*

*and DEQ has never found the District has been out of compliance.  Doc. 26-1 at ¶*

*12.  The District and golf course owner also consult on the amount of water used*

*for irrigation of the golf course.  Id. ¶ 16.*

55.     The District and DEQ "stipulated" to the golf course irrigating with

treated effluent containing nitrogen concentrations of 15 mg/l or less.

        a.      Doc. 23-1 at 2.

*Disputed.  There is no standard or maximum level expressed in mg/l for*

*nitrogen that applies to the irrigation water for the Meadow Village golf course.*

*The NMP provides for maximum amounts for volume of irrigation water*
*(expressed in millions of gallons per acre, per year) and for nutrients like nitrogen*
*(expressed in pounds of Total Nitrogen per irrigated acre, per year). It does not*
*provide a maximum concentration expressed in mg/l for nitrogen in the irrigation*
*water. Doc. 26 at ¶¶ 8, 13.*

### Defendants' Additional Facts in Opposition to Plaintiffs' Motion

56.     The effluent produced by the WRRF treatment process meets Class A
standards under DEQ Circular 2, which are the standards that apply to irrigation,
including irrigation of golf courses.  Doc. 73-1 at ¶ 4.

57.     The treated effluent is stored in lined ponds at the site.  The storage
ponds are filled during the winter months and then drained throughout the
irrigation season, which runs from approximately late May through early October
each year depending on weather conditions in a given year.  Doc. 73-1 at ¶¶ 4, 9.
All of the treated effluent from the WRRF is reused for irrigation of nearby golf
courses and other nearby properties.  Doc. 53-2 at ¶ 5.

58.     The ponds are lined with 60-mil high density polyethylene (HDPE)
liners over an engineered and native substrate to prevent infiltration of the treated
effluent into the subsurface.  *Id.* ¶ 6.

59.     DEQ's regulations specify the acceptable amount of allowed leakage
from the ponds each year.  Doc. 76-6 at 74:1-76:11.  DEQ has determined that if

the District meets the leakage criteria in DEQ's regulations—of no more than 6 inches per year—the District does not need any permit to operate the ponds.  *Id.* at 76:5-11.

60.     Defendants' expert, Mark Cunnane, concluded that the absence of Kjeldahl nitrogen and ammonia from underdrain samples provides unequivocal evidence that pond leakage to the underdrain is not occurring or is at most de minimis.  Doc. 48-2 at 12.

61.     Plaintiffs claim that the pond liners are leaking treated effluent. Plaintiffs placed fluorescein dye in the District's storage ponds.  Plaintiffs' expert placed charcoal samplers at selected locations and also collected grab samples of water for dye analysis.  Doc. 76-5 at 13.

62.     Plaintiffs' expert completed fluorescein dye analysis at his lab, which he owns (Ozark Underground Laboratory (OUL)).  *Id.*

63.     The District completed analysis of sample splits collected by Plaintiffs and also collected samples from other locations.  *Id.*

64.     District samples were analyzed by Crawford Hydrology Lab (CWL) of Western Kentucky University.  *Id.*

65.     The District has no affiliation with CWL.  *Id.*

66.     CWL uses more stringent criteria for determining a positive dye sample than OUL.  *Id.*  For example, CWL requires that a sample be measured at 10 times the detection limit, whereas OUL requires only 3 times.  *Id*.

67.     By comparing the concentration of dye in the ponds to the concentration of dye found in the underdrain, Mr. Cunnane concluded that leakage from Ponds 1 and 3 together do not exceed 1 gpm.  *Id*. at 14.

68.     Mr. Cunnane evaluated the District's ponds to determine the volumetric seepage rate that would be allowed under DEQ's standard.  Converting DEQ's standard of 6 inches per year to a rate for the District's ponds, the total allowable seepage rate from Ponds 1 and 3 is 4.4 gpm.  *Id*.

69.     Therefore, any leakage from the Ponds is below DEQ's allowable seepage rate. *Id*.

70.     The State of Montana DEQ regulates groundwater quality and administers Montana's groundwater quality permitting regulations.  *See* Mont. Admin. R. § 17.30.1001, *et seq*.

71.     DEQ's 30(b)(6) designee, Terry Campbell, testified that pursuant to section 17.30.1022(1)(g), A.R.M., DEQ would not require the District to obtain a permit for disposal of treated effluent via irrigation if the District is irrigating within the agronomic limits of the golf course turfgrass.  *See* Doc. 73-3 at 41:18-42:3; 53:21-54:12; 56:23-57:11.

72.     DEQ's 30(b)(6) designee, Terry Campbell, testified that DEQ would not require a permit for the District's storage ponds as long as the pond liners leak less than six inches per year.  Doc. 73 at ¶ 10; Doc. 73-3 at 74:3-76:11.

73.     The District voluntarily prepared a Nutrient Management Plan (NMP), which DEQ approved in April 2012.  *See* Doc. 22-1; Doc. 26-1 at ¶ 11.

74.     The NMP specifies an agronomic uptake rate of 150 pounds-per-acre-per-year for the golf course turfgrass and conservatively concludes the District can supply up to 108 pounds-per-acre-per-year of nitrogen via irrigation with reclaimed wastewater.  *See* Doc. 22-1 at 6.

75.     Plaintiffs' expert, Tom Aley, calculated that treated effluent contributed nitrogen to the golf course at a rate of 289 pounds-per-acre-per-year in 2020.  Doc. 76-3 at 32.

76.     Defendants' expert, Scott Buecker, calculated that treated effluent contributed nitrogen to the golf course at a rate of 106 pounds-per-acre in 2020.  Doc. 76-5 at 35-37.

77.     Kristin Gardner is the Executive Director of the Gallatin River Task Force, a nonprofit that is not affiliated with the District.  Deposition of Kristin Gardner ("Gardner Depo.") at 9:11-16, excerpts attached as Exhibit 1.

78.     Plaintiffs did not retain or disclose Ms. Gardner as an expert in this case.

79.    Ms. Gardner was one of the authors of the 2010 TMDL Report.  She began working on the TMDL Report in 2005.  Gardner Depo. at 52:8-20.

80.    Since the 2010 TMDL Report, additional data have caused Mr. Gardner to change her mind about the contribution of irrigation of the Meadow Village golf course's contribution to nitrogen loading in the West Fork.  *Id*. at 53:2-19.

81.    Ms. Gardner testified:

> We have learned a couple of things.· One is that the groundwater from the town center area flows towards the West Fork, and before that, it was thought that it flowed toward the South Fork.· So there's significantly other potential sources for wastewater contribution to the West Fork, knowing that information. And then we've also learned that groundwater nutrients in wells that are upgradient of the golf course have very elevated nutrient levels as well, and they are not being impacted by the golf course irrigation.· And so there's another source of wastewater, likely, because there's both elevated  nutrients and chloride that is coming from upgradient of the golf course and impacting the West Fork.

*Id*. at 53:2-19.

82.    Chris Allen is a scientist employed by WGM Group, Inc. and one of the authors of the Technical Memorandum regarding "Preliminary Estimate of Nutrient Loading and Potential Mitigation Projects," Doc. 48-9.

83.    Plaintiffs did not retain or disclose Mr. Allen as an expert in this case.

84.     The Plaintiffs noticed Mr. Allen's deposition in this case.  Prior to the

deposition, WGM Group's and Mr. Allen's attorney, Reid Perkins, sent a letter to

Plaintiffs' counsel, which requested detail on Plaintiffs' purpose for deposing Mr.

Allen and explained:

> [I]f a witness is asked to testify on their professional
> opinion or to discuss issues involving standard of care or
> causation, that witness should be formally retained as an
> expert witness. Fed. R. Civ. P., Rule 26(a)(2); and Fed. R.
> Evid., Rule 702. Opinion testimony by lay witnesses is
> "limited to one that is: (a) rationally based on the witness's
> perception, (b) helpful to clearly understand the witness's
> testimony or to determining a fact in issue; and (c) not
> based on scientific, technical or other specialized
> knowledge within the scope of Rule 702." Fed. R .Evid.,
> Rule 701.

*See* Letter from Reid Perkins to John Meyer dated September 16, 2021, attached

hereto as Exhibit 2.

85.     With regard to the Technical Memorandum's application to

consideration of irrigation of the Meadow Village golf course irrigation, Mr. Allen

testified:

> We performed no analysis to estimate the actual irrigation
> loads and whether or not the methods of irrigation would
> be increasing or otherwise managing -- or altering nitrogen
> leaching.  So we did not investigate how wastewater is
> applied to the golf course and whether or not that would
> cause leaching.

Deposition of Chris Allen ("Allen Depo.") at 22:18-24, excerpts attached as

Exhibit 3.

86.     Mr. Allen also explained that his analysis with regard to potential

sources of nitrogen loading to the West Fork was preliminary and that opinions on

causation were not performed:

> My professional opinion is that nitrogen tracking is
> extremely difficult because it is an  incredibly labile
> component.· It moves from the  subsurface very easily.·
> Subsurface dynamics and  movement are notoriously
> difficult to quantify.· None  of those analyses were
> performed as a part of this  report, and so my professional
> opinion is that I don't have the information I would require
> to make that  opinion. The report outlines potential
> sources that we  were able to say or were able -- that I feel
> comfortable stating, based on the analysis -- or the  data
> and the analysis in the data that we had providing ranges
> and knowing that most of our analysis were intentionally
> high level.· And by "high level," I  mean detailed analysis
> -- analyses at the level  required to form an opinion on
> causation were not performed.

*Id.* at 25:9-26:5.

87.     The District previously held a discharge permit under Montana's

Pollution Discharge Elimination System ("MPDES") allowing the District to

discharge to the Gallatin River.  Fourth Declaration of Ron Edwards, attached

hereto as Exhibit 4, ¶ 6.

88.     DEQ issued the District an Authorization to Discharge under the

MPDES, Permit No. MT0030384 on January 15, 1999.  *Id*. ¶ 8.  The permit

authorized the District to discharge "from its **domestic wastewater treatment**

**facilities** to receiving waters named **Gallatin River**."  *Id.* (bold in original).  The

original permit was effective from April 1, 1999 and expired on September 30, 2003. *Id.*

89.    At the time the discharge permit was issued, the District planned to construct a mile-long pipeline from the WRRF to the Gallatin River and discharge treated effluent from the WRRF to the Gallatin River. *Id.* ¶ 9.

90.    The District's discharge permit was subsequently extended, and the District submitted a permit renewal application. *Id.* ¶ 10.

91.    In November 2010, DEQ terminated the permit at the District's request because (1) the discharge structure to the Gallatin River had never been constructed and a direct discharge had never occurred from the WRRF; and (2) wastewater is land applied to the Meadow Village golf course "in accordance with review provided by the Department's Technical and Financial Assurance Bureau." *Id.* ¶ 11.

92.    DEQ notified the District that if it planned to "reactivate a discharge to state waters from the Big Sky Wastewater Treatment Plant, [the District] must complete an appropriate MPDES application." *Id.*

93.    The District has not renewed the permit because all of the effluent from the WRRF is used for irrigation. *Id.* ¶ 12.

## <u>INDEX OF EXHIBITS</u>

### Defendants' Statement of Disputed Facts

**Exhibit 1** – Excerpts from Deposition of Kristin Gardner, dated May 7, 2021

**Exhibit 2** – Letter from Reid Perkins to John Meyer dated September 16, 2021

**Exhibit 3** – Excerpts from Deposition of Chris Allen, dated September 21, 2021

**Exhibit 4** – Fourth Declaration of Ron Edwards, dated November 12, 2021

DATED this 12th day of November, 2021.

*/s/ Jacqueline R. Papez*
Jacqueline R. Papez
Cynthia D. Brooks
DONEY CROWLEY P.C.


*/s/ Jonathan W. Rauchway*
Jonathan W. Rauchway
DAVIS GRAHAM & STUBBS LLP

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 12th day of November, 2021, a true and correct copy of the foregoing **DEFENDANTS' STATEMENT OF DISPUTED FACTS** was filed and served via ECF on the following parties:

John Meyer
P.O. Box 412
Bozeman, MT 59771
(406)546-0149
john@cottonwoodlaw.org

*Counsel for Plaintiffs*


/s/ Jonathan W. Rauchway