# Exhibit A

# Big Sky Original MPDES Permit

# MONTANA DEPARTMENT OF ENVIRONMENTAL QUALITY

## AUTHORIZATION TO DISCHARGE UNDER THE

## MONTANA POLLUTANT DISCHARGE ELIMINATION SYSTEM (MPDES)

In compliance with Mont. Code Annot. Section 75-5-101 *et seq.* and ARM Title 17, Chapter 30, Subchapters 5, 6, 7, and 13.

Big Sky County Water and Sewer District 363
P.O. Box 160670
Big Sky, MT 59716

is authorized to discharge from its **domestic wastewater treatment facilities**,

to receiving waters named **Gallatin River**,

in accordance with discharge point(s), effluent limitations, monitoring requirements and other conditions set forth herein. Authorization for discharge is limited to those outfalls specifically listed in the permit. Specified load allocations support and serve to define total maximum daily loads for the receiving waters affected.

This permit shall become effective on **April 1, 1999.**

This permit and the authorization to discharge shall expire at midnight, **September 30, 2003**.

FOR THE MONTANA DEPARTMENT OF
ENVIRONMENTAL QUALITY

Frederick C. Shewman, P. E.
Supervisor, Permits Section
Water Protection Bureau

Dated this 15th day of January, 1999.

# TABLE OF CONTENTS

Cover Sheet--Issuance and Expiration Dates

I.    Effluent Limitations and Monitoring Requirements
      A.    Definitions
      B.    Description of Discharge Points
      C.    Specific Effluent Limitations
      D.    Self-Monitoring Requirements

II.   Monitoring Recording and Reporting Requirements
      A.    Representative Sampling
      B.    Monitoring Procedures
      C.    Penalties for Tampering
      D.    Reporting of Monitoring Results
      E.    Compliance Schedules
      F.    Additional Monitoring by the Permittee
      G.    Records Contents
      H.    Retention of Records
      I.    Twenty-four Hour Notice of Noncompliance Reporting
      J.    Other Noncompliance Reporting
      K.    Inspection and Entry

III.  Compliance Responsibilities
      A.    Duty to Comply
      B.    Penalties for Violations of Permit Conditions
      C.    Need to Halt or Reduce Activity not a Defense
      D.    Duty to Mitigate
      E.    Proper Operation and Maintenance
      F.    Removed Substances
      G.    Bypass of Treatment Facilities
      H.    Upset Conditions
      I.    Industrial Wastes

IV.   General Requirements
      A.    Planned Changes
      B.    Anticipated Noncompliance
      C.    Permit Actions
      D.    Duty to Reapply
      E.    Duty to Provide Information
      F.    Other Information
      G.    Signatory Requirements
      H.    Penalties for Falsification of Reports
      I.    Availability of Reports
      J.    Oil and Hazardous Substance Liability
      K.    Property or Water Rights
      L.    Severability
      M.    Transfers
      N.    Fees
      O.    Reopener Provisions

BIGSKY_MDEQ_0001001

I.   EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS

A.   Definitions.

1.   The "**30-day (and monthly) average,**" other than for fecal coliform bacteria is the arithmetic average of all samples collected during a consecutive 30-day period or calendar month, whichever is applicable.  Geometric means shall be calculated for fecal coliform bacteria.  The calendar month shall be used for purposes of reporting self-monitoring data on discharge monitoring report forms.

2.   The "**7-day (and weekly) average,**" other than for fecal coliform bacteria, is the arithmetic mean of all samples collected during a consecutive 7-day period or calendar week, whichever is applicable.  Geometric means shall be calculated for fecal coliform bacteria.  The 7-day and weekly averages are applicable only to those effluent characteristics for which there are 7-day average effluent limitations. The calendar week which begins on Sunday and ends on Saturday, shall be used for purposes of reporting self-monitoring data on discharge monitoring report forms.  Weekly averages shall be calculated for all calendar weeks in the month that have at least four days.  For example, if a calendar week overlaps two months, the weekly average is calculated only in the month that contains four or more days of that week.

3.   The "**Annual Average Load**" is the arithmetic mean of all 30-day or monthly average loads reported during the calendar year for a monitored parameter.

4.   "**BOD$_5$**" is the five-day measure of pollutant parameter biochemical oxygen demand.

5.   "**Bypass**" means the intentional diversion of waste streams from any portion of a treatment facility.

6.   A "**Daily Maximum Limit**" specifies the maximum allowable discharge of a pollutant during a calendar day.  Expressed as units of mass or volume, the daily discharge is cumulative mass or volume discharged over the course of the day. Expressed as a concentration or volume, it is the arithmetic average of all measurements taken that day.

7.   "**Department**" means the Montana Department of Environmental Quality (MDEQ).

8.   "**Director**" means the Director of the United States Environmental Protection Agency's Water Management Division.

9.   "**EPA**" means the United States Environmental Protection Agency.

10.   A "**grab**" sample, for monitoring requirements, is defined as a single dip-and-take sample collected at a representative point in the discharge stream.

11.   An "**instantaneous**" measurement, for monitoring requirements, is defined as a single reading, observation, or measurement.

12.   The term "**interference**" means a discharge which, alone or in conjunction with other contributing discharges

    a.   Inhibits or disrupts the POTW, its treatment processes or operations, or its sludge processes, use or disposal;

        **AND**

    b.   Therefore causes a violation of any requirement of the POTW's MPDES permit (including an increase in the magnitude or duration of a violation) or causes the prevention of sewage sludge use or disposal in compliance with the following statutes and regulations:  Section 405 of the Clean Water Act; 40 CFR Part 503 - Standards for the Use and Disposal of Sewage Sludge; Resource Conservation and Recovery Act (RCRA); 40 CFR Part 258 - Criteria for Municipal Solid Waste Landfills; and/or any State regulations regarding the disposal of sewage sludge.

13.   "**Load limits**" are mass-based discharge limits expressed in units such as lb/day.

14.   A "**mixing zone**" is a limited area of a surface water body or aquifer where initial dilution of a discharge takes place and where water quality changes may occur. Also recognized as an area where certain water quality standards may be exceeded.

15.   "**Nondegradation**" means the prevention of a significant change in water quality that lowers the quality of high-quality water for one or more parameters.  Also, the prohibition of any increase in discharge that exceeds the limits established under or determined from a permit or approval issued by the Department prior to April 29, 1993.

16.   The term "**pass through**" means a discharge which exits the POTW into waters of the State of Montana in quantities or concentrations which, alone or in conjunction with other discharges, is a cause of a violation of any requirement of the POTW's MPDES permit (including an increase in the magnitude or duration of a violation).

17.   "**POTW**" means a publicly-owned treatment works.

18.   "**Severe property damage**" means substantial physical damage to property, damage to the treatment facilities which causes them to become inoperable, or substantial and permanent loss of natural resources which can reasonably be expected to occur in the absence of a bypass.  Severe property damage does not mean economic loss caused by delays in production.

BIGSKY_MDEQ_0001003

19.   **"Sewage Sludge"** is any solid, semi-solid or liquid residue that contains materials removed from domestic sewage during treatment. Sewage sludge includes, but is not limited to, primary and secondary solids and sewage sludge products.

20.   The term **"TMDL"** means the total maximum daily load limitation of a parameter, representing the estimated assimilative capacity for a water body before other designated uses are adversely affected. Mathematically, it is the sum of wasteload allocations for point sources, load allocations for non-point and natural background sources, and a margin of safety.

21.   **"TSS"** is the pollutant parameter total suspended solids.

22.   **"Upset"** means an exceptional incident in which there is unintentional and temporary noncompliance with technology-based permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.

B.   Description of Discharge Points

The authorization to discharge provided under this permit is limited to those outfalls specifically designated below as discharge locations. Discharges at any location not authorized under an MPDES permit is a violation of the Montana Water Quality Act and could subject the person(s) responsible for such discharge to penalties under the Act. Knowingly discharging from an unauthorized location or failing to report an unauthorized discharge within a reasonable time from first learning of an unauthorized discharge could subject such person to criminal penalties as provided under Section 75-5-632 of the Montana Water Quality Act.

| Outfall Serial Number | Description of Discharge Point |
|---|---|
| 001 | At the end of the discharge pipe emptying to the Gallatin River, located approximately 45°15'58" N latitude, 111°15'02" W longitude. The mixing zone for the facility consists of a distance of approximately 1,000 feet in the Gallatin River equal to approximately 10 river widths. |

C.   Specific Effluent Limitations

Wastewater Effluent Limitations

Effective immediately and lasting through September 30, 2003, the quality of effluent discharged by the facility shall, as a minimum, meet the limitations as set forth below:

**Outfall 001**

| Parameter | Concentration (mg/*l*) [1] | |
|---|---|---|
| | 7-Day Average | 30-Day Average |
| BOD$_5$ | 45 | 30 |
| Total Suspended Solids | 45 | 30 |
| Phosphorus, Total (as P) | 0.75 | 0.5 |
| Nitrogen, Total (as N) [2] | 7.5 | 5.0 |
| Fecal Coliform Bacteria (Organisms/100 m*l* of effluent) | 2.2 [3] | |

(1)   See the definitions in Part I.A for explanation of terms.
(2)   Total nitrogen as N includes the sum of: nitrate+nitrite as N and total Kjeldahl nitrogen as N.
(3)   No single sample may exceed 23 coliform organisms per 100 milliliters of effluent sample.

**Outfall 001 Effluent Flow Rate Limit**

| Month [1] | Effluent flow Rate (gpm) (Daily Maximum) |
|---|---|
| March | 150 |
| April | 160 |
| May | 300 |
| June | 525 |

(1)       A discharge may take place only during the months listed.

Effluent pH shall remain between 6.0 and 9.0 std. units. For compliance purposes, any single analysis and/or measurement beyond this limitation shall be considered a violation of the conditions of this permit.

The arithmetic mean of the BOD$_5$ for effluent samples collected in a period of 30 consecutive days shall not exceed 15% of the arithmetic mean of the values for influent samples collected at approximately the same times during the same period (85% removal). This is in addition to the concentration limitations on BOD$_5$.

There shall be no discharge of floating solids or visible foam in other than trace amounts.

There shall be no discharge which causes visible oil sheen in the receiving stream.

There shall be no acute toxicity in the effluent discharged by the facility and no chronic toxicity outside the boundaries of the mixing zone.

Special Conditions

1.  No construction of a discharge point shall be allowed until the Department has approved a sewage treatment facility that can met the limits set forth in this permit.  No discharge to the river may take place until such a facility is built and demonstrates a capability of meeting the limits set forth in this permit.

2)  Discharge of treated wastewater shall only take place if the alternatives of storage, land application or snow making are not viable and freeboard considerations make lowering the storage volumes imperative.  The District shall report to the Department any anticipated discharge of treated wastewater within five days.

3)  The District is authorized under this permit to discharge only 15 million gallons during the four month period from March through June.  Flows shall not exceed the allowable monthly volumes or gallons per minute limits.

4)  If in-stream flows are less than predicted above, as calculated in Section D of this permit, the effluent flow shall be adjusted to maintain a dilution rate in the river of 500/1.

5)  Section Part IV,0 of the permit has been modified to add a 7th Reopener Provision which states modifications to the permit could be made if a change in the preferred alternative in the Big Sky Long Term Compliance Plan were made which would require a change in permit limits, facility treatment capability, wastewater disposal options or any other change which the Department considers significant.

D.  Self-Monitoring Requirements

1.  Wastewater Discharge Monitoring - Outfall 001

    a.  As a minimum, upon the effective date of this permit, the following constituents shall be monitored at the frequency and with the type of measurement indicated; samples or measurements shall be representative of the volume and nature of the monitored discharge.  If no discharge occurs during the entire reporting period, it shall be stated on the Discharge Monitoring Report Form (EPA No. 3320-1) that no discharge or overflow occurred.

**Outfall 001 - Effluent Monitoring**

| Parameter | Frequency[2] | Type[1] |
|---|---|---|
| Effluent Flow Rate [3] | Weekly/Quarterly | Instantaneous |
| BOD$_5$ | Weekly/Quarterly | Grab |
| Total Suspended Solids | Weekly/Quarterly | Grab |
| pH | Weekly/Quarterly | Grab |
| Fecal Coliform Bacteria (organisms/100 ml) | Weekly/Quarterly | Grab |
| Total Phosphorus (as P) | Weekly/Quarterly | Grab |
| Total Ammonia (as N) | Weekly/Quarterly | Grab |
| Nitrate + Nitrite (as N) | Weekly/Quarterly | Grab |

*Modified  D9-71-00*

| Parameter | Frequency[2] | Type[1] |
|---|---|---|
| Total Kjeldahl Nitrogen (as N) | Weekly/Quarterly | Grab |
| Total Nitrogen (as N) [4] | Weekly/Quarterly | Calculated |

(1)     See the definitions in Part I.A. of the permit.

(2)     Weekly during active discharge and quarterly during periods of no discharge.  Quarterly samples shall be taken in the months of March, June, September and December.

(3)     If no discharge occurs during the reporting period, **"no discharge"** shall be recorded on the DMR report form.

(4)     Total nitrogen as N includes the sum of nitrate+nitrite as N and total Kjeldahl nitrogen.

### In-stream Monitoring  *( Up stream + down stream )*

| Parameter | Frequency[2] | Type[1] |
|---|---|---|
| River Flow Rate, cfs | Weekly/Quarterly | Calculated [5] |
| Total Suspended Solids | Weekly/Quarterly | Grab |
| Total Phosphorus (as P) | Weekly/Quarterly | Grab |
| Ortho Phosphorus | Weekly/Quarterly | Grab |
| Nitrate + Nitrite (as N) | Weekly/Quarterly | Grab |
| Total Kjeldahl Nitrogen (as N) | Weekly/Quarterly | Grab |
| Dissolved Oxygen (DO) | Weekly/Quarterly | Grab |

(1)     See the definitions in Part I.A. of the permit.

(2)     Weekly during active discharge and quarterly during periods of no discharge.  Quarterly samples shall be taken in the months of March, June, September and December.

(3)     Flow shall be calculated from daily data reported from the USGS gauging station No. 06043500 located 0.3 miles downstream from Spanish Creek.  The river flow at Outfall 001 will be calculated using the following formula: Ungaged flow = ungaged area (557 sq miles) divided by the gauged area (825 sq miles ) exponent 0.85 times the gauged flow.

$$UngagedFlow = \frac{557}{825} ex0.85 X GaugedFlow \qquad\qquad eq.1$$

## II.     MONITORING RECORDING AND REPORTING REQUIREMENTS

    A.     <u>Representative Sampling</u>.  Samples taken in compliance with the monitoring requirements established under Part I shall be collected from the effluent stream prior to discharge into the receiving waters.  Samples and measurements shall be representative of the volume and nature of the monitored discharge.  Sludge samples shall be collected at a location representative of the quality of sludge immediately prior to use-disposal practice.

B.  <u>Monitoring Procedures</u>.  Monitoring must be conducted according to test procedures approved under Part 136, Title 40 of the Code of Federal Regulations, unless other test procedures have been specified in this permit.  See Part I.C. for any applicable sludge monitoring procedures.  All flow-measuring and flow-recording devices used in obtaining data submitted in self-monitoring reports must indicate values within 10 percent of the actual flow being measured.

C.  <u>Penalties for Tampering</u>.  The Montana Water Quality Act provides that any person who falsifies, tampers with, or knowingly renders inaccurate, any monitoring device or method required to be maintained under this permit shall, upon conviction, be punished by a fine of not more than $25,000, or by imprisonment for not more than six months, or by both.

D.  <u>Reporting of Monitoring Results</u>.  Self-monitoring results shall be reported monthly during times of discharge and quarterly when there is no discharge.  Quarterly samples shall be collected in March, June, September and December.  Monitoring results obtained during the previous reporting period shall be summarized and reported on a Discharge Monitoring Report Form (EPA No. 3320-1), postmarked no later than the 28th day of the month following the completed reporting period.  If no discharge occurs during the reporting period, "no discharge" shall be reported on the report form   Legible copies of these, and all other reports required herein, shall be signed and certified in accordance with the "Signatory Requirements" (see Part IV.G of this permit), and submitted to the Department at the following address:

> Montana Department of Environmental Quality
> Water Protection Bureau
> P.O. Box 200901
> Helena, Montana 59620-0901
> Phone:  (406) 444-3080

E.  <u>Compliance Schedules</u>.  Reports of compliance or noncompliance with, or any progress reports on interim and final requirements contained in any Compliance Schedule of this permit shall be submitted no later than 14 days following each schedule date.

F.  <u>Additional Monitoring by the Permittee</u>.  If the permittee monitors any pollutant more frequently than required by this permit, using approved analytical methods as specified in this permit, the results of this monitoring shall be included in the calculation and reporting of the data submitted in the Discharge Monitoring Report.  Such increased frequency shall also be indicated.

G.  <u>Records Contents</u>.  Records of monitoring information shall include:

    1.  The date, exact place, and time of sampling or measurements;

    2.  The initials or name(s) of the individual(s) who performed the sampling or measurements;

    3.  The date(s) analyses were performed;

4.    The time analyses were initiated;

5.    The initials or name(s) of individual(s) who performed the analyses;

6.    References and written procedures, when available, for the analytical techniques or methods used; and,

7.    The results of such analyses, including the bench sheets, instrument readouts, computer disks or tapes, etc., used to determine these results.

H.    <u>Retention of Records</u>.  The permittee shall retain records of all monitoring information, including all calibration and maintenance records and all original strip chart recordings for continuous monitoring instrumentation, copies of all reports required by this permit, and records of all data used to complete the application for this permit, for a period of at least three years from the date of the sample, measurement, report or application.  This period may be extended by request of the Department at any time.  Data collected on site, copies of Discharge Monitoring Reports, and a copy of this MPDES permit must be maintained on site during the duration of activity at the permitted location.

I.    <u>Twenty-four Hour Notice of Noncompliance Reporting</u>.

1.    The permittee shall report serious incidents of noncompliance as soon as possible, but no later than twenty-four (24) hours from the time the permittee first became aware of the circumstances.  The report shall be made to the Water Protection Bureau at (406) 444-3080 or the Office of Disaster and Emergency Services at (406) 841-3911.  The following examples are considered serious incidents:

a.    Any noncompliance which may seriously endanger health or the environment;

b.    Any unanticipated bypass which exceeds any effluent limitation in the permit (See Part III.G of this permit, "Bypass of Treatment Facilities".);

c.    Any upset which exceeds any effluent limitation in the permit (See Part III.H of this permit, "Upset Conditions".).

2.    A written submission shall also be provided within five days of the time that the permittee becomes aware of the circumstances.  The written submission shall contain:

a.    A description of the noncompliance and its cause;

b.    The period of noncompliance, including exact dates and times;

c.    The estimated time noncompliance is expected to continue if it has not been corrected; and,

BIGSKY_MDEQ_0001009

      d.      Steps taken or planned to reduce, eliminate, and prevent reoccurrence of the noncompliance.

    3.     The Department may waive the written report on a case-by-case basis if the oral report has been received within 24 hours by the Water Protection Bureau, by phone, at (406) 444-3080.

    4.     Reports shall be submitted to the addresses in Part II.D of this permit, "Reporting of Monitoring Results".

J.      <u>Other Noncompliance Reporting</u>.  Instances of noncompliance not required to be reported within 24 hours shall be reported at the time that monitoring reports for Part II.D of this permit are submitted.  The reports shall contain the information listed in Part II.I.2 of this permit.

K.     <u>Inspection and Entry</u>.  The permittee shall allow the head of the Department or the Director or an authorized representative thereof, upon the presentation of credentials and other documents as may be required by law, to:

    1.     Enter upon the permittee's premises where a regulated facility or activity is located or conducted, or where records must be kept under the conditions of this permit;

    2.     Have access to and copy, at reasonable times, any records that must be kept under the conditions of this permit;

    3.     Inspect at reasonable times any facilities, equipment (including monitoring and control equipment), practices, or operations regulated or required under this permit; and,

    4.     Sample or monitor at reasonable times, for the purpose of assuring permit compliance, any substances or parameters at any location.

## III.   COMPLIANCE RESPONSIBILITIES

A.     <u>Duty to Comply</u>.  The permittee must comply with all conditions of this permit.  Any permit noncompliance constitutes a violation of the Act and is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or for denial of a permit renewal application.  The permittee shall give the Department and the Director advance notice of any planned changes at the permitted facility or of an activity which may result in permit noncompliance.

B.   <u>Penalties for Violations of Permit Conditions</u>.   The Montana Water Quality Act provides that any person who violates a permit condition of the Act is subject to civil or criminal penalties not to exceed $25,000 per day or one year in prison, or both, for the first conviction, and $50,000 per day of violation or by imprisonment for not more than two years, or both, for subsequent convictions.   MCA 75-5-611(a) also provides for administrative penalties not to exceed $10,000 for each day of violation and up to a maximum not to exceed $100,000 for any related series of violations.   Except as provided in permit conditions on Part III.G of this permit, "Bypass of Treatment Facilities" and Part III.H of this permit, "Upset Conditions", nothing in this permit shall be construed to relieve the permittee of the civil or criminal penalties for noncompliance.

C.   <u>Need to Halt or Reduce Activity not a Defense</u>.   It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit.

D.   <u>Duty to Mitigate</u>.   The permittee shall take all reasonable steps to minimize or prevent any discharge in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment.

E.   <u>Proper Operation and Maintenance</u>.   The permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the conditions of this permit.   Proper operation and maintenance also includes adequate laboratory controls and appropriate quality assurance procedures.   This provision requires the operation of back-up or auxiliary facilities or similar systems which are installed by a permittee only when the operation is necessary to achieve compliance with the conditions of the permit. However, the permittee shall operate, as a minimum, one complete set of each main line unit treatment process whether or not this process is needed to achieve permit effluent compliance.

F.   <u>Removed Substances</u>.   Collected screenings, grit, solids, sludges, or other pollutants removed in the course of treatment shall be disposed of in such a manner so as to prevent any pollutant from entering any waters of the state or creating a health hazard.   Sludge shall not be directly blended with or enter either the final plant discharge and/or waters of the United States.   Any sludges removed from the facility shall be disposed of in accordance with 40 CFR 503, 258 or other applicable rule.   EPA and MDEQ shall be notified at least 180 days prior to such disposal taking place.

G.   <u>Bypass of Treatment Facilities</u>:

1.   Bypass not exceeding limitations.   The permittee may allow any bypass to occur which does not cause effluent limitations to be exceeded, but only if it also is for essential maintenance to assure efficient operation.   These bypasses are not subject to the provisions of Parts III.G.2 and III.G.3 of this permit.

BIGSKY_MDEQ_0001011

2. Notice:

    a. Anticipated bypass. If the permittee knows in advance of the need for a bypass, it shall submit prior notice, if possible at least ten (10) days before the date of the bypass.

    b. Unanticipated bypass. The permittee shall submit notice of an unanticipated bypass as required under Part II.I of this permit, "Twenty-four Hour Reporting".

3. Prohibition of bypass.

    a. Bypass is prohibited and the Department may take enforcement action against a permittee for a bypass, unless:

        (1) The bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;

        (2) There were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime. This condition is not satisfied if adequate back-up equipment should have been installed in the exercise of reasonable engineering judgement to prevent a bypass which occurred during normal periods of equipment downtime or preventive maintenance; and,

        (3) The permittee submitted notices as required under Part III.G.2 of this permit.

    b. The Department may approve an anticipated bypass, after considering its adverse effects, if the Department determines that it will meet the three conditions listed above in Part III.G.3.a of this permit.

H. <u>Upset Conditions</u>.

1. Effect of an upset. An upset constitutes an affirmative defense to an action brought for noncompliance with technology based permit effluent limitations if the requirements of Part III.H.2 of this permit are met. No determination made during administrative review of claims that noncompliance was caused by upset, and before an action for noncompliance, is final administrative action subject to judicial review (i.e., Permittees will have the opportunity for a judicial determination on any claim of upset only in an enforcement action brought for noncompliance with technology-based permit effluent limitations).

BIGSKY_MDEQ_0001012

2.    Conditions necessary for a demonstration of upset.  A permittee who wishes to establish the affirmative defense of upset shall demonstrate, through properly signed, contemporaneous operating logs, or other relevant evidence that:

    a.    An upset occurred and that the permittee can identify the cause(s) of the upset;

    b.    The permitted facility was at the time being properly operated;

    c.    The permittee submitted notice of the upset as required under Part II.I of this permit, "Twenty-four Hour Notice of Noncompliance Reporting"; and,

    d.    The permittee complied with any remedial measures required under Part III.D of this permit, "Duty to Mitigate".

3.    Burden of proof.  In any enforcement proceeding, the permittee seeking to establish the occurrence of an upset has the burden of proof.

I.    <u>Industrial Wastes</u>

1.    Each significant industrial user must be identified as to qualitative and quantitative characteristics of the discharge as well as production data.  A significant industrial user is defined as an industrial user discharging to a publicly-owned treatment works (POTW) that satisfies any of the following:

    a.    has a process wastewater flow rate of 25,000 gallons or more per average work day;

    b.    has a flow greater than five percent of the average dry-weather hydraulic or organic load carried by the municipal system receiving the waste;

    c.    has in its waste a toxic pollutant in toxic amounts as defined under Section 307(a) of the Clean Water Act of 1977, as amended, or is otherwise limited by a new or revised standard developed under Section 307(b) of the Clean Water Act; or

    d.    is found by the Department to have a significant impact on the treatment works or the quality of effluent from the POTW.

2.    The permittee must notify the Department of any new introductions by new or existing significant industrial users or any substantial change in pollutants from any significant industrial user.  Such notice must contain the information described in Part III.I.1 of this permit and be forwarded no later than sixty (60) days following the introduction or change.

BIGSKY_MDEQ_0001013

PART III
Page 15 of 20
Permit No.: MT-0030384

3.     Pretreatment Standards (40 CFR 403.5) developed pursuant to Section 307 of the Clean Water Act require that under no circumstances shall the permittee allow the introduction of the following pollutants to the waste treatment system from any source of non-domestic discharge:

   a.     Pollutants which create a fire or explosion hazard in the POTW;

   b.     Pollutants which will cause corrosive structural damage to treatment works, but in no case, discharges with a pH lower than 5.0, unless the POTW is designed to accommodate such discharges;

   c.     Solid or viscous pollutants in amounts which will cause obstruction to the flow in sewers, or other interference with the operation of the POTW;

   d.     Any pollutant, including oxygen demanding pollutants (BOD, etc.), released in a discharge of such volume or strength as to cause interference in the POTW; or,

   e.     Heat in amounts which will inhibit biological activity in the POTW resulting in interference, but in no case, heat in such quantities that the temperature at the treatment works influent exceeds 40°C. (104°F.) unless the POTW is designed to accommodate such heat;

   f.     Pollutants which cause interference or pass through.

4.     In addition to the general limitations expressed above, more specific pretreatment limitations have been and will be promulgated for specific industrial categories under Section 307 of the Clean Water Act.  (See 40 CFR, Subchapter N, Parts 400 through 500, for specific information).

5.     The permittee shall provide adequate notice to the Department of:

   a.     Any new introduction of pollutants into the treatment works from an indirect discharger (i.e., industrial user) which would be subject to Sections 301 or 306 of the Clean Water Act if it were directly discharging those pollutants;

   b.     Any substantial change in the volume or character of pollutants being introduced into the treatment works by a source introducing pollutants into the treatment works at the time of issuance of the permit; and

   c.     For the purposes of this section, adequate notice shall include information on:

(1)   The quality and quantity of effluent to be introduced into such treatment works; and

(2)   Any anticipated impact of the change on the quantity or quality of effluent to be discharged from such publicly owned treatment works.

6.   At such time as a specific pretreatment limitation becomes applicable to an industrial user of the permittee, the Department may, as appropriate, do the following:

a.   Amend the permittee's MPDES discharge permit to specify the additional pollutant(s) and corresponding effluent limitation(s) consistent with the applicable national pretreatment limitation;

b.   Require the permittee to specify, by ordinance, contract, or other enforceable means, the type of pollutant(s) and the maximum amount which may be discharged to the permittee's facility for treatment.   Such requirement shall be imposed in a manner consistent with the POTW program development requirements of the General Pretreatment Regulations at 40 CFR 403; and/or,

c.   Require the permittee to monitor its discharge for any pollutant which may likely be discharged from the permittee's facility, should the industrial user fail to properly pretreat its waste.

7.   The Department retains, at all times, the right to take legal action against the industrial user and/or the treatment works, in those cases where a permit violation has occurred because of the failure of an industrial user to discharge at an acceptable level.   If the permittee has failed to properly delineate maximum acceptable industrial contributor levels, the Department will look primarily to the permittee as the responsible party.

## IV.   GENERAL REQUIREMENTS

A.   <u>Planned Changes</u>.   The permittee shall give notice to the Department as soon as possible of any planned physical alterations or additions to the permitted facility.   Notice is required only when:

1.   The alteration or addition could significantly change the nature or increase the quantity of pollutant discharged.   This notification applies to pollutants which are not subject to effluent limitations in the permit; or,

2. There are any planned substantial changes to the existing sewage sludge management practices of storage and disposal. The permittee shall give the Department notice of any planned changes at least 180 days prior to their implementation.

B. <u>Anticipated Noncompliance</u>. The permittee shall give advance notice to the Department of any planned changes in the permitted facility or activity which may result in noncompliance with permit requirements.

C. <u>Permit Actions</u>. This permit may be revoked, modified and reissued, or terminated for cause. The filing of a request by the permittee for a permit modification, revocation and reissuance, or termination, or a notification of planned changes or anticipated noncompliance, does not stay any permit condition.

D. <u>Duty to Reapply</u>. If the permittee wishes to continue an activity regulated by this permit after the expiration date of this permit, the permittee must apply for and obtain a new permit. The application must be submitted at least 180 days before the expiration date of this permit.

E. <u>Duty to Provide Information</u>. The permittee shall furnish to the Department, within a reasonable time, any information which the Department may request to determine whether cause exists for revoking, modifying and reissuing, or terminating this permit, or to determine compliance with this permit. The permittee shall also furnish to the Department, upon request, copies of records required to be kept by this permit.

F. <u>Other Information</u>. When the permittee becomes aware that it failed to submit any relevant facts in a permit application, or submitted incorrect information in a permit application or any report to the Department, it shall promptly submit such facts or information with a narrative explanation of the circumstances of the omission or incorrect submittal and why they weren't supplied earlier.

G. <u>Signatory Requirements</u>. All applications, reports or information submitted to the Department shall be signed and certified.

1. All permit applications shall be signed by either a principal executive officer or ranking elected official.

2. All reports required by the permit and other information requested by the Department shall be signed by a person described above or by a duly authorized representative of that person. A person is considered a duly authorized representative only if:

a. The authorization is made in writing by a person described above and submitted to the Department; and,

b.   The authorization specifies either an individual or a position having responsibility for the overall operation of the regulated facility, such as the position of plant manager, superintendent, position of equivalent responsibility, or an individual or position having overall responsibility for environmental matters.  (A duly authorized representative may thus be either a named individual or any individual occupying a named position.)

3.   Changes to authorization.  If an authorization under Part IV.G.2 of this permit is no longer accurate because a different individual or position has responsibility for the overall operation of the facility, a new authorization satisfying the requirements of Part IV.G.2 of this permit must be submitted to the Department prior to or together with any reports, information, or applications to be signed by an authorized representative.

4.   Certification.  Any person signing a document under this section shall make the following certification:

"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

H.   <u>Penalties for Falsification of Reports</u>.  The Montana Water Quality Act provides that any person who knowingly makes any false statement, representation, or certification in any record or other document submitted or required to be maintained under this permit, including monitoring reports or reports of compliance or noncompliance shall, upon conviction be punished by a fine of not more than $25,000 per violation, or by imprisonment for not more than six months per violation, or by both.

I.   <u>Availability of Reports</u>.  Except for data determined to be confidential under 40 CFR Part 2, all reports prepared in accordance with the terms of this permit shall be available for public inspection at the offices of the Department.  As required by the Clean Water Act, permit applications, permits and effluent data shall not be considered confidential.

J.   <u>Oil and Hazardous Substance Liability</u>.   Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties to which the permittee is or may be subject under Section 311 of the Clean Water Act.

K.  <u>Property or Water Rights</u>.  The issuance of this permit does not convey any property or water rights of any sort, or any exclusive privileges, nor does it authorize any injury to private property or any invasion of personal rights, nor any infringement of federal, state or local laws or regulations.

L.  <u>Severability</u>.  The provisions of this permit are severable, and if any provision of this permit, or the application of any provision of this permit to any circumstance, is held invalid, the application of such provision to other circumstances, and the remainder of this permit, shall not be affected thereby.

M.  <u>Transfers</u>.  This permit may be automatically transferred to a new permittee if:

　　1.  The current permittee notifies the Department at least 30 days in advance of the proposed transfer date;

　　2.  The notice includes a written agreement between the existing and new permittees containing a specific date for transfer of permit responsibility, coverage, and liability between them;

　　3.  The Department does not notify the existing permittee and the proposed new permittee of an intent to revoke or modify and reissue the permit.  If this notice is not received, the transfer is effective on the date specified in the agreement mentioned in Part IV.M.2 of this permit; and

　　4.  Required annual and application fees have been paid.

N.  <u>Fees</u>.  The permittee is required to submit payment of an annual fee as set forth in ARM 17.30.201.  If the permittee fails to pay the annual fee within 90 days after the due date for the payment, the Department may:

　　1.  Impose an additional assessment consisting of 15% of the fee plus interest on the required fee computed at the rate established under 15-31-510(3), MCA, or

　　2.  Suspend the processing of the application for a permit or authorization or, if the nonpayment involves an annual permit fee, suspend the permit, certificate or authorization for which the fee is required.  The Department may lift suspension at any time  up to one year after the suspension occurs if the holder has paid all outstanding fees, including all penalties, assessments and interest imposed under this sub-section.  Suspensions are limited to one year, after which the permit will be terminated.

BIGSKY_MDEQ_0001018

O.  <u>Reopener Provisions</u>.  This permit may be reopened and modified (following proper administrative procedures) to include the appropriate effluent limitations (and compliance schedule, if necessary), or other appropriate requirements if one or more of the following events occurs:

  1.  <u>Water Quality Standards</u>:  The water quality standards of the receiving water(s) to which the permittee discharges are modified in such a manner as to require different effluent limits than contained in this permit.

  2.  <u>Water Quality Standards are Exceeded</u>:  If it is found that water quality standards or trigger values in the receiving stream are exceeded either for parameters included in the permit or others, the department may modify the effluent limits or water management plan.

  3.  <u>TMDL or Wasteload Allocation</u>:  TMDL requirements or a wasteload allocation is developed and approved by the Department and/or EPA for incorporation in this permit.

  4.  <u>Water Quality Management Plan</u>:  A revision to the current water quality management plan is approved and adopted which calls for different effluent limitations than contained in this permit.

  5.  <u>Sewage Sludge</u>:  There have been substantial changes (or such changes are planned) in sludge use or disposal practices; applicable management practices or numerical limitations for pollutants in sludge have been promulgated which are more stringent than the requirements in this permit; and/or it has been determined that the permittee's sludge use or disposal practices do not comply with existing applicable state or federal regulations.

  6.  <u>Toxic Pollutants</u>:  A toxic standard or prohibition is established under Section 307(a) of the Clean Water Act for a toxic pollutant which is present in the discharge and such standard or prohibition is more stringent than any limitation for such pollutant in this permit.

  7.  <u>Permitted Alternative</u>:  A change in the preferred alternative in the <u>Big Sky Long Term Compliance Plan</u> which would require a change in permit limits, facility treatment capability, wastewater disposal options or any other change which the Department considers significant.

BIGSKY_MDEQ_0001019