# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

COTTONWOOD ENVIRONMENTAL
LAW CENTER, MONTANA RIVERS,
and GALLATIN WILDLIFE
ASSOCIATION,

|  |
|---|
| **2:20-cv-00028-BU-BMM** |

 Plaintiffs,

vs.

**ORDER**

RON EDWARDS, in his official
capacity as Manager of the Big Sky Water
and Sewer District; and BIG SKY
WATER AND SEWER DISTRICT,

 Defendants.

## INTRODUCTION

Cottonwood Environmental Law Center, Montana Rivers, and Gallatin
Wildlife Association ("Plaintiffs") brought this action against Ron Edwards in his
official capacity as Manager of the Big Sky Water and Sewer District and the Big
Sky Water and Sewer District (collectively "Big Sky District"). Plaintiffs allege that
Big Sky District violated the Clean Water Act ("CWA") when they discharged
pollutants into the West Fork of the Gallatin River without a National Pollutant
Discharge Elimination System (NPDES) permit. (Doc. 8). Big Sky District and

Plaintiffs filed competing motions for summary judgment. (Docs. 72 & 75). The Court held a hearing on the motions on November 17, 2021. (Doc. 88).

## BACKGROUND

### *Statutory Background*

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish that goal, Congress prohibited the "addition" of any pollutant from a "point source" to "navigable waters" without a NPDES permit. *Id.* § 1311(a). The CWA authorizes the Administrator of the U.S. Environmental Protection Agency ("EPA") or a delegated state agency to issue a NPDES permit to an entity that seeks to discharge pollution into navigable waters. *See U.S. EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 202–03 (1976); *Milwaukee v. Illinois*, 451 U.S. 304, 310–311 (1981). EPA authorized the Montana Department of Environmental Quality ("MT DEQ") to run its own discharge permit system, known as the Montana Pollutant Discharge Elimination System ("MPDES").

The CWA defines "pollutant" broadly to include any solid waste, sewage, incinerator residue, heat, discarded equipment, sand, as well as industrial, municipal, and agricultural waste. 33 U.S.C. § 1362(6). It further defines a "point source" as "any discernible, confined and discrete conveyance [. . .] from which pollutants are or may be discharged," including, for example, any "pipe, ditch, channel, tunnel,

conduit" or "well." *Id.* § 1362(14). The CWA defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." § 1362 (12).

## Factual Background

Big Sky District provides wastewater and sewer services for the resort community at Big Sky, Montana. Big Sky District's service area encompasses over 6,000 acres and includes single-family residences, condominiums and townhouses, hotels, restaurants, and commercial centers. Big Sky District collects water from district water users for treatment at its Water Resources Recovery Facility ("WRRF").

The current WRRF began operations in 1996. Big Sky District upgraded the WRRF in 2004 to increase its treatment capacity. The Big Sky District's user base has grown significantly in recent years. MT DEQ noted in 2020 that the WRRF "is at capacity and does not allow the District to produce reclaimed effluent of the quality needed for reuse activities." (Doc. 23-1 at 3). MT DEQ further opined that the WRRF is "pushed to the limit during wet-weather and spring run-off conditions [. . .] resulting in elevated nitrogen, biological oxygen demand and total suspended solids leaving the treatment facility." (Doc. 23-1 at 2–3).

The WRRF treatment process removes debris and grit, treats nitrogen through aerobic and anaerobic conditioning, filters the water, and finally disinfects the water.

3

Although wastewater goes through a significant treatment process at the WRRF, the treated effluent retains many pollutants, including nitrogen. Excess nitrogen causes algae blooms in rivers and streams that can harm aquatic animal and plant life.

Big Sky District stores the treated effluent in lined wastewater holding ponds at the WRRF. Big Sky District disposes of all its treated effluent through irrigation—primarily by irrigating the neighboring Meadow Village Golf Course during the summer months. Big Sky District has a 99-year lease for land disposal of its treated wastewater on the Meadow Village Golf Course that runs through 2076. (Doc. 22-4).

MT DEQ regulates Big Sky District's land disposal irrigation through a Nutrient Management Plan ("NMP"). (Doc. 22-1). The NMP governs irrigation of the Meadow Village Golf Course to ensure that the turf grass and plants along the course absorb the nitrogen delivered through irrigation. (*Id.* at 11–12, 16, 25). The NMP's goal remains to prevent excess nitrogen and other nutrients from leaching into the groundwater and migrating into surface waters. (Doc. 22-1 at 11, 16, 25). Boyne U.S.A., Inc. ("Boyne"), the Meadow Village Golf Course owner and operator, is not a party to the NMP. Big Sky District controls the quality, quantity, and timing of effluent used in irrigation in compliance with the NMP. Big Sky District also tracks compliance with the NMP through its operation of lysimeters to monitor nutrient levels on the Meadow Village Golf Course. (Doc. 22-1 at 19–21).

4

Meadow Village Golf Course has installed a French drain system to avoid ponding of irrigation water and precipitation.

The West Fork of the Gallatin River flows alongside the WRRF, the treated effluent holding ponds, and the Meadow Village Golf Course. In 2010, MT DEQ placed the West Fork of the Gallatin River on its CWA Section 303(d) list of water quality impaired streams. (Doc. 23-3 at 76 (citing 33 U.S.C. § 1313(d))). To address the water quality issue, in 2010, MT DEQ published a Total Maximum Daily Load and corresponding water quality improvement plan to clarify the maximum amount of nitrogen that the West Fork of the Gallatin River could receive and still meet state water quality standards. (Doc. 23-3 at 76–79). MT DEQ observed that nitrogen levels in the West Fork of the Gallatin River already exceed maximum quantity, and that river nitrogen originates from sources including "improper management of land-applied effluent." (Doc. 23-3 at 83–86).

Groundwater that percolates from the Meadow Village Golf Course naturally sits in aquifers beneath Big Sky District's lined holding ponds. The groundwater in these aquifers is hydrologically connected to the West Fork of the Gallatin River. If the groundwater level rises too high, the groundwater would "float" the holding pond liner. This floating of the holding pond liner, in turn, would lead to effluent spillover from the holding pond. Big Sky District diverts groundwater under its holding ponds

into the West Fork of the Gallatin River using an underdrain pipe system to prevent such spillover.

Plaintiffs allege that Big Sky District over-irrigates the Meadow Village Golf Course. Plaintiffs allege that this over-irrigation causes nitrogen and other pollutants to flow downhill and enter the West Fork of the Gallatin via two mechanisms: 1) the Meadow Village Golf Course's French drains; and/or 2) leaching into the groundwater system which Big Sky District then pipes into the West Fork of the Gallatin River via the underdrain system.

Plaintiffs conducted a fluorescein dye test to determine if, and where, pollutants from the WRRF report to the West Fork of the Gallatin river. (Doc. 76-3). Plaintiffs' testing indicates that fluorescein dye added to the wastewater holding ponds at the WRRF reports to the West Fork of the Gallatin River near the underdrain discharge point and in the drainage system for the Meadow Village Golf Course. (*Id.* at 21-22). Plaintiffs claim the dye results demonstrate that the storage ponds currently leak about 10 gallons of treated effluent per minute, and that the leakage gets discharged to the West Fork of the Gallatin River via the underdrain. (Doc. 76-3 at 32-33). Big Sky District's expert admits that Plaintiffs' study demonstrates the storage ponds currently leak, but Big Sky District's expert claims that Plaintiffs cannot quantify the leakage rate. (Doc. 76-5 at 15). Big Sky District's

expert also suggests that only a de minimis quantity of irrigation water enters the golf course drain. (*Id.*)

Plaintiffs allege that Big Sky District must seek a NPDES permit for the discharge of nitrogen originating in its holding ponds and entering the West Fork of the Gallatin River via the underdrain pipe system and the Meadow Village French drains. Plaintiffs also allege that Big Sky District must seek a NPDES permit for discharge of nitrogen applied as irrigation to the Meadow Village Golf Course that discharges via the French drain system.

*Legal Standard*

Summary judgment is proper if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of informing the Court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

The movant satisfies its burden when the documentary evidence produced by the parties permits only one conclusion. *Anderson*, 477 U.S. at 251–52. Where the moving party has met its initial burden, the party opposing the motion "may not rest

7

upon the mere allegations or denials of his pleading, but [. . .] must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (internal quotation marks omitted).

## ANALYSIS

The parties' motions for summary judgment present the following issues: 1) whether Big Sky District is a proper party for Plaintiffs' claims relating to the Meadow Village Golf Course French drain system; 2) whether the WRRF wastewater holding ponds and/or underdrain system is a point source conveyance of a pollutant requiring an NPDES permit; 3) whether Ron Edwards is a proper party given that Big Sky District is a defendant; and 4) whether civil penalties can be awarded should Plaintiffs prevail.

## I.   Big Sky District Is Not the Proper Party for the Alleged CWA Violation Regarding the Meadow Village Golf Course French Drain System.

Plaintiffs allege that Big Sky District violates the CWA by over-irrigating the Meadow Village Golf Course and thus adding nitrogen pollutants beyond the agronomic uptake rate. (Doc. 76 at 18-24). To assert a violation of the Clean Water Act, the Plaintiffs must establish that "the defendant (1) discharged, i.e., added (2) a pollutant (3) to navigable waters (4) from (5) a point source." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1083 (9th Cir. 2019) (quoting *Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993)).

Plaintiffs identify three potential point-source mechanisms by which the irrigation-based nitrogen pollution enters the West Fork of the Gallatin River: 1) the French drain system on the Meadow Village Golf Course; 2) the underdrain pipe system beneath the WRRF wastewater holding ponds; and 3) the WRRF wastewater holding ponds themselves. Big Sky District argues that it is entitled summary judgment with respect to any claims pertaining to the French drain system on the Meadow Village Golf Course because it does not own or operate the Meadow Village Golf Course. (Doc. 74 at 12-14).

The relevant inquiry regarding control of a point source under the Clean Water Act is not which entity generates the pollutant, but which entity controls the discharging point source mechanism. *See Friends of Outlet Creek v. Grist Creek Aggregates, LLC*, No. 16-cv-00431, 2018 U.S. Dist. LEXIS 225499, at *20 (N.D. Cal. Apr. 23, 2018) Thus, it is "ownership of a point source [that] will trigger liability" and "not the discharge-causing conduct." *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1144 (10th Cir. 2005), as corrected (Oct. 21, 2005).

Meadow Village Golf Course maintains control over and owns the French drain system that Plaintiffs argue violates the CWA. Plaintiffs argue that because Big Sky District operates the irrigation system and has ultimate control over when and how much irrigation water is applied, that Big Sky District should be liable for the alleged violations of the CWA. Big Sky District's control over the wastewater

9

quantity and quality does not change the fact that Meadow Village Golf Course ultimately stands as the liable party for discharges from its French drain system. Meadow Village Golf Course would be required to apply for and receive an NPDES permit if the discharge of irrigation water from the French drain system were found to constitute a CWA violation. Big Sky District correctly argues that it is not the proper party for allegations of CWA violations that arise from discharges through the Meadow Village Golf Course's French drain system.

The Court will grant Plaintiffs leave to amend their Complaint (Doc. 8) to include the Meadow Village Golf Course's owner, Boyne, as a party in this lawsuit. Allowing leave to amend will further judicial economy and will not prejudice Boyne. Big Sky District indemnifies Boyne from suits stemming from its irrigation. (Doc. 22-4 at 6-7). Big Sky District must "defend all actions [connected with the operation, maintenance and use of the irrigation system] and pay all charges of attorneys and all of the costs and expenses of any kind arising out of any such liability, damage, loss, claims, demands and actions." (Doc. 22-4 at 6-7). Plaintiffs were able to access the Meadow Village Golf Course French drain system during discovery to conduct fluorescein dye studies. (Doc. 76-2 at 19-20).

## II. Factual Disputes Regarding the WRRF Holding Ponds and Underdrain Preclude Summary Judgement for Either Party.

Having determined that the proper defendant has not been presented the opportunity to defend against Plaintiffs' allegations regarding the Meadow Village

Golf Course French drain system, the Court will not analyze now whether the French drain system constitutes a point source discharge of a pollutant in violation of the CWA. The Court will confine its analysis to the two alleged point sources in the control of Big Sky District—the WRRF underdrain pipe and wastewater holding ponds. The Court determines, for the reasons discussed below, that summary judgment would not be appropriate for either party with respect to those potential point sources.

As noted previously, to establish a violation of the CWA Plaintiffs must demonstrate "the defendant (1) discharged, i.e., added (2) a pollutant (3) to navigable waters (4) from (5) a point source." *Pac. Coast Fed'n of Fishermen's Ass'ns*, 945 F.3d at 1083. No dispute exists that water from the holding ponds, via leakage from the wastewater holding ponds and irrigation on the golf course, enters the West Fork of the Gallatin River, a navigable waterway. (Doc. 84 at 8-9.)

Big Sky District makes the following arguments against CWA liability: 1) the fluorescein dye tests completed by Plaintiff do not demonstrate that nitrogen pollution from the WRRF is being discharged to the West Fork of the Gallatin River; 2) the WRRF wastewater holding ponds do not constitute a point source; and 3) the underdrain pipe is not adding any pollutants, but merely providing a preferential path for groundwater flow. (Doc. 74 at 16-24). Plaintiffs argue that the fluorescein dye tests prove that nitrogen pollution from the WRRF reaches the West Fork of the

11

Gallatin River. (Doc. 77 at 16-17.). Plaintiffs argue that, having established that any pollution from the WRRF discharges from the underdrain pipe, an NPDES permit shall be required and summary judgment would be appropriate. (*Id.*)

The parties' arguments present factual disputes that must be resolved at trial. The Court first must determine whether Big Sky District discharges a pollutant to the West Fork of the Gallatin River. Big Sky District argues that most, if not all, of the nitrogen load from irrigation remains immobilized in soils or captured by agronomic uptake. Big Sky District also argues that given the many potential sources of nitrogen contamination upstream of the golf course and WRRF, the source of nitrogen loading in the groundwater below the golf course and wastewater holding ponds has not been determined.

The Court possesses serious doubts as to the validity of Big Sky District's contentions. The transport of fluorescein dye appears to indicate of the transport of nitrogen pollution. The Court recognizes, however, that Big Sky District's argument presents a genuine factual dispute as to whether Big Sky District is the party discharging the nitrogen. Big Sky District's argument also presents the question of how and in what quantity nitrogen is reaches the West Fork of the Gallatin River, in particular with respect to the irrigation water.

The Court then must determine that a point source conveyance, or the functional equivalent, discharges that pollutant into the West Fork of the Gallatin

River. *See Cnty. of Maui v. Hawaii Wildlife Fund*, __ U.S. __, __, 140 S. Ct. 1462, 1476 (2020). Plaintiffs' alleged point source mechanisms under the control of Big Sky District involve at least some groundwater transport before the pollutants allegedly report to the West Fork of the Gallatin River. Regardless of whether Big Sky District applies the pollutant via irrigation at the Meadow Village Golf Course, or pollutant transport results from leakage from the WRRF wastewater holding ponds, the pollutant will move through an aquifer before reaching the WRRF underdrain pipe or the West Fork of the Gallatin River directly.

The U.S. Supreme Court provided guidance on pollutant discharges that travel through groundwater. The U.S. Supreme Court determined that a discharge to groundwater may be a point source where it is "the functional equivalent of a direct discharge." *Cnty. of Maui*, 140 S. Ct. at 1476. "Whether pollutants that arrive at navigable waters after traveling through groundwater are 'from' a point source depends upon how similar to (or different from) the particular discharge is to a direct discharge." *Id.* The U.S. Supreme Court enumerated the following factors for Courts to consider when assessing a functional equivalent of a direct discharge:

> "(1) transit time, (2) distance traveled, (3) the nature of the material through which the pollutant travels, (4) the extent to which the pollutant is diluted or chemically changed as it travels, (5) the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source, (6) the manner by or area in which the pollutant enters the navigable waters, (7) the degree to which the pollution (at that point) has maintained its specific identity."

13

*Id.* at 1476-77. Time and distance should be considered the most important factors. *Id.* at 1477.

The parties' disputes over these factors preclude summary judgment. The parties' experts disagree on the pollutant transport mechanisms, the nature of the subsurface material with regard to its effect on pollutant transport, the amount of pollutant entering the West Fork of the Gallatin River, and the extent to which the pollutant dilutes or chemically changes as it travels. (*Compare* Doc. 76-2 *with* Doc. 76-3). Given that the Supreme Court listed precisely those contended issues for courts to consider when evaluating a functional equivalent of a direct discharge, the Court cannot conclude that no dispute of material fact exists.

Clarifying the factual disputes proves particularly necessary in this case, where the CWA violations asserted by Plaintiffs may be more properly addressed by state regulation. Congress intended to leave substantial responsibility and autonomy to the States with respect to groundwater pollution and nonpoint source pollution. *Id.* at 1471. The State of Montana regulates both the acceptable amount of leakage from the WRRF holding ponds (Doc. 73 at ¶ 10) and the agronomic uptake rates and irrigation practices at the Meadow Village Golf Course. (Doc. 22-1). The Court must establish facts sufficient to determine whether the discharges alleged by Plaintiffs more properly should be regulated by the State of Montana. The Court cannot do so without first having determined pollutant transport and quantity. The

14

Court will deny both parties' motions for summary judgement with respect to the merits of the CWA claims.

At oral argument the Court asked Big Sky District whether the pipes discharging into the wastewater holding ponds at the WRRF could be considered a point source discharge, The Court will request that the parties submit supplemental briefs to address that issue.

## III.   Ron Edwards Is Not a Proper Party Given that Big Sky District Is a Defendant.

Plaintiffs sue Ron Edwards "in his official capacity" as the manager of the Big Sky Water and Sewer District. (Doc. 8 at ¶ 33). Big Sky District argues that suing Ron Edwards in his official capacity while bringing the same claims against the Big Sky Water and Sewer District is duplicative. (Doc. 74 at 28-29). The Court agrees.

Where a complaint asserts the same claims "against a municipal entity and a municipal official in his or her official capacity, federal courts will dismiss the official-capacity claim." *Thorpe ex rel. D.T. v. Breathitt Cnty. Bd. of Educ.*, 932 F. Supp. 2d 799, 802 (E.D. Ky. 2013); *see also Grissom v. Dist. of Columbia*, 853 F. Supp. 2d 118, 125 (D.D.C. 2012). Plaintiffs will not be denied any form of relief if the Court dismisses Ron Edwards. The Court will grant summary judgment for all claims against Ron Edwards in his official capacity as Manager of the Big Sky Water and Sewer District.

**IV.    Plaintiffs May Seek Civil Penalties.**

Big Sky District argues that Plaintiffs should not be allowed to seek civil penalties because Plaintiffs failed to plead such relief. (Doc. 74 at 25-27). Big Sky District notes that Plaintiffs did not explicitly request CWA civil penalties in their Complaint. Plaintiffs' Complaint requests declaratory and injunctive relief, litigation costs and expenses, and "other such relief as the Court may deem just and proper." (Doc. 8 at 12). Big Sky District argues that Plaintiffs request for "other relief" represents boilerplate language that cannot include monetary relief when the complaint otherwise only includes equitable relief. (Doc. 74 at 26-27).

The plain language of the Clean Water Act undermines Big Sky District's argument. The CWA explicitly provides that illegal pollutant discharges subject the discharger to civil penalties. 33 U.S.C. §1319(d). Big Sky District cannot claim to be caught unaware of potential penalties when the CWA clearly prescribes civil penalties and establishes the exact factors that courts shall consider when assessing those penalties. *Id.* The citizen suit provision of the CWA also clearly states that district courts "shall have jurisdiction [. . .] to apply any appropriate civil penalties." 33 U.S.C. §1365(a). The fact that Plaintiffs request another form of monetary relief weakens Big Sky District's argument. The Court will allow Plaintiffs to amend their Complaint to seek civil penalties.

16

Big Sky District raises only one potential source of prejudice resulting from the Court allowing the Plaintiffs to seek civil penalties. Big Sky District notes that defendants in CWA suits often retain experts to provide an opinion on the civil penalties. (Doc. 74 at 27). Big Sky District did not seek an expert opinion on civil penalties in this case and points out that discovery has now closed. (*Id.*) To alleviate Big Sky District's concerns of potential prejudice the Court will allow both parties limited discovery before briefing the proper remedies should Plaintiffs succeed on their CWA claims.

## ORDER

Accordingly, **IT IS ORDERED** that:

- Plaintiffs' Motion for Summary Judgment (Doc. 75) is **DENIED**.

- Defendants' Motion for Summary Judgment (Doc. 72) is **GRANTED, IN PART, AND DENIED, IN PART**.

  - Ron Edwards is dismissed from this case.

  - Big Sky District is not the proper party for Plaintiffs' allegations related to the Meadow Village Golf Course French drain system.

- Plaintiffs may amend their Complaint (Doc. 8) to add Boyne, as owner of the Meadow Village Golf Course, as a party to this suit

- Plaintiffs may amend their Complaint (Doc. 8) to include civil penalties in the prayer for relief.

17

- The parties shall each submit a supplemental brief addressing whether discharge pipes to the WRRF wastewater storage ponds could be considered a point source conveyance. The supplemental brief may not exceed 10 pages and must be submitted by January 28, 2021.

- Should Plaintiffs' CWA claims succeed, the Court will allow both parties limited discovery and briefing to address the proper civil penalties that should be imposed.

Dated the 17th day of December, 2021.


Brian Morris, Chief District Judge
United States District Court

18