# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BUTTE DIVISION

| | |
|---|---|
| COTTONWOOD ENVIRONMENTAL LAW CENTER, MONTANA RIVERS, and GALLATIN WILDLIFE ASSOCIATION, | **2:20-cv-00028-BU-BMM** |
| Plaintiffs, | |
| vs. | **ORDER** |
| RON EDWARDS, in his official capacity as Manager of the Big Sky Water and Sewer District; and BIG SKY WATER AND SEWER DISTRICT, | |
| Defendants. | |

## INTRODUCTION

Cottonwood Environmental Law Center, Montana Rivers, and Gallatin Wildlife Association ("Plaintiffs") brought this action against the Big Sky Water and Sewer District ("Big Sky District"). (Doc. 8.) Plaintiffs allege that Big Sky District violated the Clean Water Act ("CWA") when they discharged pollutants into the West Fork of the Gallatin River without a National Pollutant Discharge Elimination System (NPDES) permit. (*Id.*).

Big Sky District and Plaintiffs previously filed competing motions for

summary judgment. (Docs. 72 & 75.) The Court denied Plaintiffs' motion for summary judgment and denied Big Sky District's motion for summary judgment with respect to the alleged point sources in control of Big Sky District. (Doc. 89.) The Court determined that factual disputes remained as to whether a CWA violation existed. (*Id.* at 10-15). The Court requested additional briefing from the parties pertaining to the potential point sources in control of Big Sky District. (*Id.* at 18.)

Following the Court's order denying summary judgment for either party, Big Sky District demanded a jury trial and Plaintiffs filed a Second Motion for Summary Judgment. (Docs. 96 & 101.) Plaintiffs' Second Motion for Summary Judgment contends that a trial is "unnecessary" and requests that the Court revisit the arguments that Plaintiffs raised on their first motion for summary judgment. (Doc. 101 at 1-2.)

To seek further clarity over the Parties' disputed facts, the Court required the Parties to answer a set of questions addressing the *County of Maui v. Hawaii Wildlife Fund,* __ U.S. __, __, 140 S. Ct. 1462, 1476 (2020), factors established by the U.S. Supreme Court. (Doc. 108.) The Court's questions correspond with those designed by the District of Hawaii after the U.S. Supreme Court remanded *County of Maui.* The District of Hawaii relied upon those questions as it considered whether the case could be decided on summary judgment upon remand. *See Hawaii Wildlife Fund v. Cnty. of Maui*, 1:12-cv-00198-SOM-KJM, Doc. 456.

2

The Court will deny Plaintiffs' Second Motion for Summary Judgment for the reasons discussed below. The Court also recognizes that this case presents questions of law that this Court has yet to answer. The remaining legal questions should be resolved before trial, to ensure that only questions involving findings of fact remain for the jury. The Court will clarify, therefore, the following three legal issues: 1) Plaintiff's arguments alleging a direct discharge under the control of Big Sky District fail; 2) that the Water Resources Recovery Facility ("WRRF") holding ponds constitute a point source under the CWA if leaking a pollutant; and 3) that Montana law does not exempt Big Sky District from CWA permitting requirements if leakage at the WRRF constitutes an indirect discharge.

## I.     Plaintiffs' Second Motion for Summary Judgment

The Court first will address Plaintiffs' Second Motion for Summary Judgment. Big Sky District argues that Plaintiffs' Second Motion for Summary Judgment effectively entails a motion for reconsideration of the Court's summary judgment order. (Doc. 109 at 3-5.) Big Sky District contends that Plaintiffs have failed to comply with the procedural requirements for a motion for reconsideration and have failed to carry the legal burden for a motion for reconsideration. (*Id.*) The Court agrees.

Plaintiffs' briefs establish clearly that this Second Motion for Summary Judgment provides no new grounds for the Court to consider. Plaintiffs simply

disagree with the Court's determination that this case must go to trial to resolve the remaining factual disputes. Plaintiffs have failed to comply with the local rules for seeking a motion for reconsideration. This Court requires that parties request leave to file a motion to reconsider. Local Rule 7.3(a). Plaintiffs failed to request leave to file this motion.

The Court would deny Plaintiffs' motion for a request for leave to file a motion for reconsideration even if Plaintiffs properly had requested reconsideration. For the Court to grant a motion for leave to file a motion for reconsideration a plaintiff must demonstrate the following:

> (1) (A) the facts or applicable law are materially different from the facts or applicable law that the parties presented to the court before entry of the order for which reconsideration is sought, and (B) despite the exercise of reasonable diligence, the party applying for reconsideration did not know such fact or law before entry of the order; or
>
> (2)  new material facts emerged or a change of law occurred after entry of the order.

Local Rule 7.3(b). "No motion for leave to file a motion for reconsideration may repeat any oral or written argument made by the applying party before entry of the order." Local Rule 7.3(c).

Plaintiffs base this Second Motion for Summary Judgment on the same facts and legal arguments that Plaintiffs presented in their first motion for summary judgment. Plaintiffs argue that the Court erred in its first order on summary

judgment, because, Plaintiffs claim, the record has established that pollution from the WRRF holding ponds discharges directly into the West Fork of the Gallatin River from the WRRF underdrain pipe. (*See* Doc. 101 at 1-2.) Plaintiffs raised this argument in their first motion for summary judgment. (*See* Doc. 77 at 8-9 ("The District is directly discharging 21.12 million gallons of treated sewage per year from a pipe below the holding ponds into the West Fork.").) The Court addressed this argument in its first order on summary judgment. (Doc. 89 at 13 ("Plaintiffs' alleged point source mechanisms under the control of Big Sky District involve at least some groundwater transport before the pollutants allegedly report to the West Fork of the Gallatin River.").)

To clarify this issue before trial, the Court states plainly now that leakage from the WRRF holding ponds does not directly discharge into the West Fork of the Gallatin River. The Court also declares that the WRRF underdrain pipe does not cause a direct discharge of a pollutant. The Court will discuss those conclusions further in Part II of this Order. A violation of the CWA caused by an indirect discharge remains the only potential CWA violation with respect to Big Sky District.

The Court sought further clarification of the factual disputes in this case to assist in evaluating Plaintiffs' Second Motion for Summary Judgment and to aid the Court by identifying the factual disputes that remain for trial. (Doc. 108.) The Court ordered the parties to address questions related to each of the *County of Maui* factors.

(*Id.*) The answers provided by Plaintiffs and Big Sky District further demonstrate that factual disputes between the parties' experts persist such that the Court cannot grant summary judgment for either Party. (*Compare, e.g.*, Doc. 113 at 1 (stating a minimum transit time of "26.5 hours") *with* Doc. 112 at 7 (claiming "no evidence dye in river leaked from ponds").)

Plaintiffs' Second Motion for Summary Judgment (Doc. 101) represents a procedurally inadequate motion for reconsideration and fails to meet the legal standard for a motion for reconsideration. The Court will deny Plaintiffs' Second Motion for Summary Judgment.

## II. Plaintiffs cannot support a direct discharge theory from the WRRF holding ponds or the underdrain pipe.

Plaintiffs have argued that treated effluent directly discharges from the WRRF holding ponds to the West Fork of the Gallatin River though the WRRF underdrain pipe. (*See* Doc. 101 at 1.) The Court will clarify for the final time that this argument lacks merit. The Court will not permit Plaintiffs to argue a direct discharge theory at trial.

Plaintiffs' expert claims that pollutants leak from the Big Sky District's holding ponds, enter the groundwater system below the holding ponds, and flow either to the West Fork of the Gallatin River through the aquifer, or via the WRRF underdrain pipe. (Doc. 76-3 at 21-22.) Either mechanism requires that the initial discharge from the WRRF holding ponds flows to groundwater. Plaintiffs concede

6

in their response to the Court's questions that the underdrain pipe is not connected to the WRRF holding ponds. (*See* Doc. 113 at 6.) The parties disagree with respect to the distance that water flows from leaks in the WRRF holding ponds to the underdrain pipe. The Parties do not dispute, however, that some transport through groundwater occurs. (*Id.*; Doc. 112 at 10.)

The U.S. Supreme Court recently explained that the discharge of a pollutant that flows from a point source, through groundwater, then to a navigable water of the United States, does not constitute a direct discharge of a pollutant. *Cnty. of Maui*, __ U.S. at ___, 140 S. Ct. at 1476. Plaintiffs in a CWA claim must demonstrate that the alleged discharge of pollution represents the "functional equivalent of a direct discharge." *Id.* The U.S. Supreme Court explained that "[w]hether pollutants that arrive at navigable waters after traveling through groundwater are 'from' a point source depends upon how similar to (or different from) the particular discharge is to a direct discharge." *Id.*

Plaintiffs' theory that the WRRF underdrain pipe constitutes a point source that discharges treated effluent also fails. The WRRF underdrain serves to prevent the groundwater level beneath the holding ponds from rising so high as to "float" the holding pond liner. The "floating" of the liner could cause a spillover of treated effluent. The WRRF underdrain pipe, on the other hand, provides a preferential flow path for water in the aquifer beneath the holding ponds, once the aquifer reaches a

particular elevation.

Plaintiff has argued that, because the underdrain pipe conveys effluent-polluted waters, the underdrain pipe causes a violation of the CWA. Plaintiffs' Second Motion for Summary Judgment supports this argument by citing to *Northern Plains Resource Council v. Fidelity Exploration and Development Company*, 325 F.3d 1155, 1164 (9th Cir. 2003). As this Court discussed in its prior order, *Northern Plains Resource Council* demonstrates the legal error in Plaintiffs' argument: the underdrain pipe does not connect two otherwise unconnected water bodies. (*See* Doc. 108 at 2.)

In *Northern Plains Resource Council*, the methane-extraction company would drill conventional wells into a coal seam and pump the trapped water from that seam to the surface to reduce underground pressure. 325 F.3d at 1158. The extracted water contained a litany of pollutants recognized by the CWA. *Id.* The extraction company would then discharge the extracted water from a pipe directly into a navigable waterway. *Id.* The water trapped in the coal seam had no path to the navigable waterway before the extraction company installed the pipe. *Id.*

The Ninth Circuit determined that the extraction company had violated of the CWA when it conveyed polluted water from one *disconnected* water body *directly* to a navigable water of the United States. *Id.* at 1165. Unlike in *Northern Plains Resource Council*, the parties agree that the groundwater beneath the WRRF and the

8

West Fork of the Gallatin River represent a hydrologically connected water body. (*See, e.g.*, Docs. 53 at 17; 77 at 11.) This concession precludes Plaintiffs' theory of a direct discharge from the underdrain pipe.

The U.S. Supreme Court faced a similar issue in *South Florida Water Management District v. Miccosukee Tribe of Indians*, 541 U.S. 95, 105 (2004). There the defendant pumped water from a canal directly to a wetland in response to water in the canal reaching a maximum height. *Id.* at 100. The water from the canal contained elevated levels of phosphorous in comparison to the wetlands due to human activities around the canal. *Id.* The plaintiffs alleged that the conveyance of phosphorous-polluted water from the canal to the wetland constituted a "discharge of a pollutant" that violated the CWA. *Id.* at 102-103.

The U.S. Supreme Court determined that, though plaintiffs were correct in arguing that the point source need not be the original source of the phosphorous pollution, the record was unclear whether the canal and wetlands were truly distinct water bodies. *Id.* at 109-10. The U.S. Supreme Court remanded the case to the district court, with the direction that if the district court should find the canal and wetlands to be hydrologically connected, the district court was required to conclude that the defendants did not need an NPDES permit to pump water between the canal and the wetlands. *Id.* at 111-12.

The underdrain pipe stands in a similar position to the pump in *South Florida*

9

*Water Management District* in this respect. The underdrain pipe, like the pump in *South Florida Water Management District*, creates a nonnatural flow of water in order to regulate water levels. The underdrain pipe also may transport pollutants from one part of the hydrological system to another part with a lower concentration of pollution. The underdrain pipe does not transport pollutants, however, between two disconnected bodies of water. The Parties agree that the water from the aquifer below the WRRF would reach the West Fork of the Gallatin River regardless of the existence of the underdrain pipe. This fact prohibits Plaintiffs' theory that the underdrain pipe causes a CWA violation. *See S. Fla. Water Mgmt. Dist.*, 541 U.S. at 111-12.

The act of moving water between locations within a hydrologically connected system does not violate the CWA, regardless of whether the source water differs in pollutant characteristics to water that it would otherwise eventually meet. As the U.S. Supreme Court stated, "[i]f one takes a ladle of soup from a pot, lifts it above the pot, and pours it back into the pot, one has not 'added' soup or anything else to the pot." *Id.* at 110. (quoting *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481 at 492 (2d Cir. 2001).

The record before the Court establishes that the underdrain pipe neither directly connects to the WRRF holding ponds, nor connects two distinct waterbodies. Based on these facts, Plaintiffs cannot argue a tenable direct discharge

theory from the underdrain pipe.

The Court will clarify, however, that it may be the case that the WRRF underdrain pipe contributes to the *functional equivalent of a direct discharge*. If the underdrain pipe has an effect on the "(1) transit time, (2) distance traveled, (3) the nature of the material through which the pollutant travels, (4) the extent to which the pollutant is diluted or chemically changed as it travels, (5) the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source, (6) the manner by or area in which the pollutant enters the navigable waters, [and/or] (7) the degree to which the 4 pollution (at that point) has maintained its specific identity," then the WRRF underdrain pipe proves relevant to consideration whether an indirect discharge occurs. *See Cnty. of Maui,* 140 S. Ct. at 1476-77.

## III.   The WRRF holding ponds constitute a point source if the holding ponds leak a pollutant.

The Court refrained from addressing the question of whether the WRRF holding ponds constituted a point source in the prior summary judgment order. Big Sky District claims that the Ninth Circuit has not yet answered this question. (Doc. 74 at 9.) Had Plaintiffs failed to demonstrate that pollutants from the WRRF holding ponds reach a navigable waterway, as Big Sky District argues, the Court would not have had needed to answer this first-instance question. Following Big Sky District's jury trial demand, however, the Court recognizes the need to resolve this

question before trial to ensure clarity for the jury. The Court determines that the WRRF holding ponds represent a point source under the CWA if they contribute an indirect discharge of nitrogen to the West Fork of the Gallatin River.

"To establish a violation of the CWA, 'a plaintiff must prove that defendants (1) discharged, i.e., added (2) a pollutant (3) to navigable waters (4) from (5) a point source.'" *Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1083 (9th Cir. 2019) (quoting *Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993)). This conclusion comports with the analysis in *County of Maui* that the CWA "forbids the 'addition' of any pollutant from a 'point source' to 'navigable waters' without the appropriate permit." 140 S. Ct. at 1468. The CWA defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The CWA further defines a point source as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." *Id.* § 1362(14); *see also Greater Yellowstone Coal. v. Lewis*, 628 F. 3d 1143, 1152 (9th Cir. 2010).

"It is well settled that the starting point for interpreting a statute is the language of the statute itself." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987). The Court notes that CWA includes in its definition of a

"point source" items such as "container," "well" and "contaminated animal feeding operation" 33 U.S.C. § 1362(14). Each of these items are similar in character to a holding pond in the sense that they confine a body of water.

Big Sky District argues that the WRRF holding ponds do not constitute a point source and relies on the Ninth Circuit's reasoning in *Greater Yellowstone Coalition v. Lewis* for support. (Doc. 74 at 9-11.) The factual circumstances in *Greater Yellowstone Coalition* differ from the circumstances in this case. The reasoning in *Greater Yellowstone Coalition* supports a determination, however, that a holding pond constitutes a point source.

The plaintiffs in *Greater Yellowstone Coalition* challenged the expansion of a hard-rock mine. *Greater Yellowstone Coal.*, 628 F. 3d at 1146. As part of the mine expansion, the mining company would have to continue adding selenium-contaminated waste rock to its waste rock storage area. *Id.* at 1146-47. The mining company sought to limit future water pollution by covering the extracted waste rock pile. *Id.* at 1147. The mine planned to cover the waste rock in an upwardly convex manner in order to limit the percolation of rainwater through the contaminated waste rock. *Id.* This cover would serve to reduce the transport of selenium pollution to the aquifer below. *Id.* The cover thus did not collect polluted water, but diverted natural water away from the contaminated waste rock beneath. *Id.* at 1153. The Ninth Circuit recognized that the cover did not constitute a point source because there was "no

13

confinement or containment of the water." *Id.* A point source requires that the water be "collected or channeled." *Id.*

The WRRF holding ponds, unlike the waste rock cover in Greater Yellowstone Coalition, provide for the collection, confinement, and containment of Big Sky District's nitrogen-polluted waters. Whereas the mining company planned the waste rock cover in *Greater Yellowstone Coalition* to direct natural ambient waters away from a source of pollution, the WRRF holding ponds exist solely to contain effluent water and keep pollution from reaching natural ambient waters.

The Ninth Circuit stated "that the case law [is] clear that some type of collection or channeling is required to classify an activity as a point source." *Id.* The WRRF holding ponds undeniably *collect* effluent water. If the holding ponds do not contain the effluent water, and instead collects effluent water and then discharge some of that effluent water to a navigable waterway, those holding ponds would constitute a point source under the reasoning in *Greater Yellowstone Coalition*. *See id.*; *also N.W. Envtl. Def. Ctr. v. Brown*, 617 F.3d 1176, 1181–82 (9th Cir. 2010) (defining a point source as collecting or channeling a pollutant and then discharging that pollutant to a navigable waterway). The Tenth Circuit in *United States v. Earth Sciences*, 599 F.2d 368 (10th Cir. 1979), similarly recognized that when a confinement system "fails because of flaws in the construction or inadequate size [. . .] the escape of liquid from the confined system is from a point source."

14

District courts in the Ninth Circuit consistently have found ponds and settling basins to be point sources because they are a "confined and discrete conveyance" which, as a result of leaks, seeps, or overflow, discharge pollutants to surface waters. *See, e.g.*, *Wash. Wilderness Coal. v. Hecla Mining Co.*, 870 F. Supp. 983, 988-89 (E.D. Wash. 1994) (determining that ponds holding mining wastewater are point sources, "because the pond or pile acts to collect and channel contaminated water"); *N. Cal. River Watch v. Redwood Landfill Inc.*, 2007 WL 4557783, at *4 & n.3 (N.D. Cal. 21 Dec. 2007) (determining that a landfill is point source); *N. Cal. River Watch v. Mercer Fraser Co.*, 2005 WL 2122052 at *2 (N.D. Cal. 1 Sept. 2005) (determining that a settling basin for collecting wastewater is point source). So, too, have other Circuit Courts. *See*, *e.g.*, *Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 45 (5th Cir. 1980) (determining that leachate from eroded "spoil piles," and overflows from sediment basins, were discharges from a "point source"); *Earth Sci., Inc.*, 599 F.2d at 374 (concluding that overflows or leaks from "sump pit" were from a point source).

The Ninth Circuit explicitly adopted the Tenth Circuit's reasoning on point source discharges from *Earth Sciences, Inc*. *See Trustees for Alaska v. EPA*, 749 F.2d 549, 558 (9th Cir. 1984) (also citing the Fifth Circuit's decision in *Sierra Club,* 620 F.2d at 45, in support of point source discharge); *also Nw. Env't Def. Ctr. v. Brown*, 617 F.3d at1182. Big Sky District argues that the Ninth Circuit limited its

agreement with *Earth Sciences* to the rejection of a permitting exemption for mining activities. Big Sky District's argument proves to be a distinction without a difference. The crucial reasoning that the Ninth Circuit adopted from *Earth Sciences* was that "when mining activities release pollutants from a discernible conveyance, they are subject to NPDES regulation, as are all point sources." *Trustees for Alaska*, 749 F.2d at 558 (citing *Earth Sciences*, 599 F.2d at 373); *see also Nw. Env't Def. Ctr.*, 617 F.3d 1176, 1182 (9th Cir. 2010). *Earth Sciences* involved the overflow of two "sumps," each of which was constituted by a "pool" where water contaminated by mining activities would collect and then be pumped for reuse. *Earth Sciences*, 599 F.2d at 373. Big Sky District's holding ponds provide the exact same function as the sumps at issue in *Earth Sciences*. The WRRF holding ponds contain Big Sky District's polluted water until it can be used on the Meadow Village Golf Course.

Big Sky District also relies on the Fourth Circuit's decision in *Sierra Club v. Virginia Electric & Power Co.,* 903 F.3d 403 (4th Cir. 2018) ("*VEPCO*") to support the argument that the holding ponds do not constitute a point source. The facts and legal circumstances of *VEPCO* are distinguishable from the holding ponds in this case. The Court finds some reasoning in VEPCO unpersuasive in light of the decisions cited above.

The plaintiffs in *VEPCO* alleged a CWA violation against a coal power plant based on the discharge of arsenic from coal ash piles. 903 F.3d at 406. The power

16

plant stored coal ash—a byproduct of coal combustion—in a lined landfill and in unlined settling ponds. *Id.* The only CWA permit held by the coal power plant allowed the discharge of water from the settling ponds after the water underwent additional treatment. The district court determined that arsenic in the coal ash leached into the groundwater system and then into nearby navigable waterways. *Id.* The district court reasoned that the coal ash piles concentrated coal ash in one location and conveyed polluted water into the groundwater system in violation of the CWA. *Id.* at 410.

The Fourth Circuit reversed on the basis that the landfill and settling ponds did not constitute point sources under the CWA. *Id.* at 413. The Fourth Circuit recognized that the coal ash piles contributed arsenic to the aquifer, but stated that "the landfill and ponds were not created to convey anything and did not function in that manner." *Id.* at 411. The seepage caused by the coal ash piles was "diffuse" and "a generalized, site-wide condition that allowed rainwater to distribute the leached arsenic widely into the groundwater of the entire peninsula." *Id.* The Fourth Circuit determined that the landfill and settling ponds could not be characterized as discrete points because "like the rest of the soil at the site," the coal ash piles were "static recipients of the precipitation and groundwater that flowed through them." *Id.*

The Fourth Circuit also relied consistently on the fact that coal ash ponds are subject to federal regulation under the Resource Conservation and Recovery Act

("RCRA"), 42 U.S.C.A. § 6901 et seq. RCRA required "operators of coal ash landfills, surface impoundments, and similar facilities obtain permits incorporating the EPA's regulations pertaining to the disposal of coal combustion residuals." *Id.* at 412 (citing 42 U.S.C. § 6945(d)). The Fourth Circuit determined that the district court misunderstood "the distinctions Congress made between the CWA and the RCRA," and that "groundwater pollution from solid waste falls squarely within the regulatory scope of the RCRA." *Id.*

The Fourth Circuit also reasoned that the dispersed percolation of rainwater and groundwater through the landfill and seepage ponds rendered the task of measuring the rate of pollution from the coal ash piles "virtually impossible." The CWA was intended to target only the "measurable" discharge of pollutants. *Id.* at 411. The Fourth Circuit concluded that percolation from the coal ash piles could not be regulated under the CWA. *Id.*

The facts and legal landscape of this case differ from *VEPCO*. Most notably, the coal ash piles in VEPCO were not intended to contain or convey water. As the Fourth Circuit highlighted, natural water either percolated through static piles of coal ash due to rainfall or the groundwater system became contaminated as a result of coal ash being present at the groundwater table.  *Id.* at 411-12. Big Sky District specifically built the WRRF holding ponds to contain effluent water. The WRRF holding ponds qualify as a discrete container of polluted effluent, in contrast with

the solid waste coal ash piles in *VEPCO*.

No federal laws regulates the pollutants contained in the WRRF holding ponds in the manner that RCRA regulates coal ash. RCRA classified coal ash and other coal combustion residuals as nonhazardous waste. *See* 40 C.F.R. §§ 257.50, 257.53. RCRA provides specific guidelines for coal ash facilities and groundwater quality monitoring. *See* 40 C.F.R. §§ 257.90–257.98. The Fourth Circuit relied, in part, upon the federal regulatory structure for coal ash under RCRA when it determined that the coal ash piles were not point sources under the CWA. *Id.* at 412. No federal law provides similar regulation of the effluent in Big Sky District's holding ponds.

The holding ponds in this case also do not pose the same measurability issues that were present in *VEPCO*. Whereas the Fourth Circuit stated that it was impossible to measure effluent characteristics as rainwater seeped through the coal ash piles, the holding ponds present far less difficulty. The water in the holding ponds can be measured directly. Big Sky District's sewage system transmits effluent waters to the holding ponds via a pipe. It would be possible to measure effluent characteristics from either the pipe or from the WRRF ponds themselves. Determining the pollutant load that occurs from a leak may require additional calculations, but *County of Maui* supports the notion that some groundwater transport does not preclude measurability.

The Court notes that determining the exact load of pollutant requires some

extrapolation even from the end of a pipe. Regulators can only ever look at a snapshot of the pollutant concentrations being discharged and can only observe average or maximum recorded concentrations. Measurement techniques exist to extrapolate the pollutant load that exists in a wastewater holding pond, a coal ash pile, or a waste rock storage facility. The seepage rate of the particular pollutant, precipitation events, evaporation, and agronomic uptake rates can all be calculated. Courts should not provide a loophole for polluters simply because the amount of pollutant being discharged proves somewhat more difficult to measure.

The Ninth Circuit has provided guidance on the types of discharges that should be considered nonpoint sources as a result of the difficulty to identify the source of pollution through individual permits. According to the Ninth Circuit, nonpoint sources involve widely dispersed activities that cannot be traced to any single discrete source, such as residue left on roadways by automobiles. *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1184 (9th Cir.2002). The Ninth Circuit listed "[s]mall amounts of rubber [] worn off of the tires of millions of cars and deposited as a thin film on highways; minute particles of copper dust from brake linings [] spread across roads and parking lots each time a driver applies the brakes; [and] drips and drabs of oil and gas" on driveways and streets. *Id.* The WRRF holding ponds pose none of the same issues. Pollution at the WRRF holding pond arises from a single activity—Big Sky

District's sewage system—and may be traced to a discrete source.

In light of the plain language of the CWA and Ninth Circuit precedent, the Court determines that the WRRF holding ponds would constitute a point source if the holding ponds discharge a pollutant by leakage, seepage, or overflow. The Court will clarify that in determining whether a leaking holding pond constitutes a point source, the Court has not determined that the WRRF holding ponds cause an indirect discharge of a pollutant to the West Fork of the Gallatin River. As the Court stated above and in its summary judgment order, the Court cannot determine based on the Parties' competing expert reports whether the WRRF holding ponds leak a pollutant that then enters the West Fork of the Gallatin River, or, if so, whether that leakage constitutes the functional equivalent of a direct discharge. Both questions present an issue of fact for a jury to decide at trial. The Court limits its determination to the legal finding that the WRRF holding ponds, if they leak a pollutant, qualify as a point source under the CWA.

## IV.   Montana law does not supersede CWA permitting requirements where an indirect discharge occurs.

Plaintiffs express concern with the Court's statement that "the CWA violations asserted by Plaintiffs may be more properly addressed by state regulation." (Doc. 89 at 14.) Plaintiffs cite *Northern Plains Resource Council* to support the argument that state law cannot create exceptions to the permitting requirements of the CWA. (Doc. 101 at 1 (citing *N. Plains Res. Council*, 325 F.3d

at 1164).) In light of the complicated issues of federalism pertaining to water regulation, the Court emphasizes that Montana law would not exempt Big Sky District from complying with the CWA's permitting requirements for indirect discharges.

> In the Court's summary judgement order the Court stated the following:
>
> Congress intended to leave substantial responsibility and autonomy to the States with respect to groundwater pollution and nonpoint source pollution. The State of Montana regulates both the acceptable amount of leakage from the WRRF holding ponds and the agronomic uptake rates and irrigation practices at the Meadow Village Golf Course. The Court must establish facts sufficient to determine whether the discharges alleged by Plaintiffs more properly should be regulated by the State of Montana.

(Doc. 89 at 14 (internal citations omitted).) Nonpoint source pollution and most groundwater pollution are governed by the states, as the CWA is limited to the protection of navigable waters of the United States. *See Cnty. of Maui*, 140 S. Ct. 1471. The Court's prior statement simply points out that, should Plaintiffs fail to demonstrate the functional equivalent of a direct discharge, Plaintiffs would lack a cognizable claim under the CWA. Plaintiffs would be required to address leakage or agronomic uptake issues under the laws and regulations of the State of Montana.

The Court's summary judgment order did not state that the laws of Montana supersede the requirements of the CWA. States cannot create exceptions to the CWA that relieve permitting requirements. *See* 33 U.S.C. § 1370 (states may not adopt or enforce standards that are less stringent than federal standards). The Supremacy

22

Clause of the United States Constitution further requires that, where the CWA and state law conflict, the CWA provides the law of the land. U.S. Const. art. VI, cl. 2; *see also Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 851 (9th Cir. 2002) (quoting *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712, (1985)) (recognizing that the Supremacy Clause "invalidates state laws that interfere with, or are contrary to, federal law"). If a jury determines that leakage from the WRRF holding ponds constitutes the functional equivalent of a direct discharge, no law of the State of Montana will exempt Big Sky District from CWA permitting requirements.

## ORDER

Accordingly, **IT IS ORDERED** that:

- Plaintiffs' Second Motion for Summary Judgment (Doc. 101) is **DENIED**.

Dated the 30th day of March, 2022.

Brian Morris, Chief District Judge
United States District Court