John Meyer
Cᴏᴛᴛᴏɴᴡᴏᴏᴅ Eɴᴠɪʀᴏɴᴍᴇɴᴛᴀʟ Lᴀᴡ Cᴇɴᴛᴇʀ
P.O. Box 412 Bozeman, MT 59771
John@cottonwoodlaw.org
406.546.0149

*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| COTTONWOOD ENVIRONMENTAL LAW CENTER, <br> *Plaintiff*, <br><br> v. <br><br> BIG SKY WATER AND SEWER DISTRICT; BOYNE USA, INC. <br><br> *Defendants* | 2:20-cv-00028-BMM <br><br> **BRIEF IN SUPPORT OF MOTION TO SET ASIDE JUDGMENT FOR FRAUD ON THE COURT** |

## INTRODUCTION

Plaintiff Cottonwood Environmental Law Center ("Cottonwood") respectfully moves the Court to set aside judgement in favor of Defendant Big Sky Water & Sewer District ("Sewer District") for fraud on the Court. The Court should grant this motion because Jon Rauchway, attorney for Defendant Sewer District, and Ron Edwards, manager of the Sewer District, intentionally and materially misrepresented evidence that was directly aimed at the jury. Mr. Rauchway and Mr. Edwards intentionally provided data that was never recorded as part of a scheme to improperly influence the jury. The Court unknowingly directed the jury to consider the falsified evidence when deciding whether the Big Sky Water & Sewer District violated the Clean Water Act.

## PROCEDURAL AND FACTUAL BACKGROUND

On July 10, 2020, Cottonwood filed a lawsuit against the Big Sky Water & Sewer District and Ron Edwards, in his official capacity as manager of the Big Sky Water & Sewer District, alleging the Defendants violated the Clean Water Act. Doc. 1. The Court dismissed Edwards as a Defendant on December 17, 2021. Doc. 89 at 15. At the same time, the Court also denied Cottonwood's motion for summary judgment, in part, because of the parties' dispute regarding "the amount of pollutant entering the West Fork of the Gallatin River." Doc. 89 at 14. The Court determined

"[t]he State of Montana regulates [] the acceptable amount of leakage from the WRRF holding ponds. . .  The Court must establish facts sufficient to determine whether the discharges alleged by Plaintiffs more properly should be regulated by the State of Montana. The Court cannot do so without first having determined pollutant transport and quantity." Doc. 89 at 14 (citation omitted). The Court ordered the parties to answer supplemental questions regarding leakage from the holding ponds, specifically asking, "[w]hat is the minimum number of total gallons of wastewater that leaks from the WRRF holding pond each day?" Doc. 112 at 14. Without providing a water balance, Defendant Big Sky Water & Sewer District answered, "[a] de minimis amount of leakage." *Id.*[1]

Cottonwood filed a complaint with the Montana Department of Environmental Quality ("DEQ") asking it to investigate unpermitted effluent discharges from the Sewer District's holding ponds on September 17, 2021. Ex. 1. The day before the jury trial in this case, more than six months after the original complaint was filed with the Montana DEQ, the agency sent Cottonwood a letter stating it used the data the Big Sky Water and Sewer District provided it (Ex. 3 at 1) and could not determine whether the holding ponds were experiencing "gross leakage." Ex. 3 at 2.

---

[1] During its 30(b)(6) deposition, a representative for the Montana DEQ testified that leakage can be determined by calculating the water balance—a mathematical equation that adds the volume of effluent brought into the plant plus the amount of precipitation subtracted by the volume exported and evaporation. Ex. 2 at 136-137.

In April 2022, the Court held a two-day jury trial to determine whether Defendant Big Sky Water & Sewer District violated the Clean Water Act. During the trial, Terry Campbell, a twenty-nine year engineer for the Montana DEQ that helped investigate Cottonwood's complaint regarding leakage from the holding ponds, testified that Montana's gross leakage standard only applies when the holding liners are new, not when they are twenty years old. Ex. 4 at 27. Mr. Campbell also testified that if there are rips or tears in the liners, they "certainly" should be replaced. Ex. 4 at 29.

During the trial, Mr. Rauchway and Mr. Edwards told the jury that the total amount of effluent that reached the West Fork in 2020 was 270,000 gallons, or 0.27 million gallons. Ex. 5 at 208. To reach this number, Rauchway and Edwards walked the jury through detailed mathematical calculations to create a water balance. Ex. 5. at 201–208. In particular, Mr. Rauchway walked Mr. Edwards through a series of questions that informed the jury that Cottonwood's expert failed to consider the volume of treated effluent that was exported to the Yellowstone Club and Spanish Peaks during the non-irrigation season. Ex. 5 at 205–206. Mr. Rauchway led Mr. Edwards through a series of well-rehearsed calculations regarding exports to Spanish Peaks and the Yellowstone Club during the non-irrigation season. Ex. 5 at 206. Mr. Rauchway had Mr. Edwards tell the jury that only 0.27 million gallons of treated effluent leaked from the holding ponds. Ex. 5 at 208. The other 20 million gallons

3

that Cottonwood's expert said leaked from the holding ponds, according to Mr.

Rauchway and Mr. Edwards, was actually exported to Spanish Peaks and the

Yellowstone Club. Ex. 5 at 206.

> Mr. Rauchway closed his argument by going through each of the *Maui* factors:
>
> Number 8, the total amount of pollutant that reaches the West Fork. This is perhaps the most important. These factors are not in any particular order, but how much are we talking about here? . . . You saw Mr. Edwards correct Mr. Aley's pond balance to show that this is a minimal amount of leakage. It's far less than DEQ standard. And that appears to be conceded by the plaintiffs now. We're talking about 100 times less than their expert claims, and 10 times less than DEQ's standard.

Ex. 10 at 320-321. At the end of the trial, the Court gave Instruction 14(8), which

directed the jury to determine whether the plaintiffs had proved the functional

equivalent of a direct discharge by considering, among other things, "[t]he total

amount of pollutant that reaches the West Fork." Doc. 141 at 16–17. The jury

returned a verdict in favor of Big Sky Water & Sewer District. Doc. 143.

Cottonwood moved for a new trial, which the Court denied on September 6,

2022. Doc. 198. The Court decided it would "not order a new trial because the jury

performed its duty in weighing the evidence presented to it and came out against

Plaintiffs. The Court notes that Plaintiffs' expert admitted to misinterpreting the

leakage data and thereby miscalculating the results as presented in his expert reports

during the trial." Doc. 198 at 2.

4

Cottonwood filed a complaint in state court against Edwards, Big Sky Water & Sewer District, and the Montana DEQ regarding the leaking holding ponds and the agency's investigation on December 12, 2022. *Cottonwood Envtl. L. Ctr. v. Montana Dep't. of Envtl. Quality*, 22-cv-1121A (Gallatin Cnty.). The complaint alleged the Sewer District was liable for violations of civil nuisance, criminal nuisance, Montana Water Quality Act, and the Montana Constitution. The complaint alleged the DEQ violated the Montana Constitution and Montana Water Quality by failing to complete the investigation and determine whether the Big Sky holding ponds were experiencing gross leakage. *Id.* During his deposition, <u>Ron Edwards admitted that the export data he presented to the federal jury was never recorded</u>. Ex. 6 at 42–43. Mr. Edwards testified that meters broke and the Sewer District was not able to replace them because of supply chain issues during Covid. Ex. 6 at 42.  Mr. Edwards testified that the export volumes and leakage calculation were based on "estimates." Ex. 6 at 43. Mr. Rauchway and Mr. Edwards never disclosed to the jury or the Court that the export data never existed or that the evidence was based on "estimates."

Mr. Edwards testified in the state case that the Montana DEQ and U.S. EPA were provided with the same unrecorded data. Ex. 6 at 40. During its 30(b)(6) deposition, the Montana DEQ representative testified that the agency was unaware that Edwards provided it with data that did not exist. Ex. 7 at 77; 102. When the U.S EPA learned that the 2020 data had not been recorded, it accepted Cottonwood's

calculations that the volume of leakage from the holding ponds in 2020 was 7.257 million gallons, not the .27 million gallons that Mr. Rauchway and Mr. Edwards estimated. Ex. 9 at 7. The EPA balanced the years 2015 through 2020 and determined leakage was less than 0.1% between estimated inflows and estimated outflows. Ex. 9 at 7. To reach this conclusion, the EPA assumed the data show the Sewer District exported more than 40 million gallons of treated effluent than came into the plant in 2015 and more than 37 million gallons than came into the plant in 2016. Ex. 9 at 7. It is physically impossible for the Sewer District to export more effluent than was brought into the plant. Ms. Bronson, another attorney that represented the Big Sky Water & Sewer District during the federal jury trial, instructed Mr. Edwards not to answer the question of how the 2020 water balance that was provided during the trial compares to the five years preceding. Ex. 6 at 44.

Ultimately, the state district court dismissed Ron Edwards and the Sewer District as defendants and stated, "Cottonwood's recourse if it believes that the District presented 'false evidence' at the federal trial is to raise the issue with the Federal District Court, not to collaterally attack those proceedings in this Court." *Cottonwood Envt. L. Ctr. v. Big Sky Water & Sewer District No. 363, et. al.*, DV-16-2022-0001121-OC (Gallatin Cnty.) (Doc. 105).

6

## LEGAL STANDARD

The Supreme Court has repeatedly held that federal courts possess the inherent power "to vacate [their] own judgments upon proof that a fraud has been perpetrated upon the court." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 115 L. Ed. 2d 27, 111 S. Ct. 2123 (1991) (citing *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 88 L. Ed. 1250, 64 S. Ct. 997 (1944)). The power to grant "equitable relief against fraudulent judgments is not of statutory creation." *Hazel-Atlas*, 322 U.S. at 248. "This equitable power was firmly established in English practice long before the foundation of our Republic, and the power is vested in courts by their very creation." *Fierro v. Johnson*, 194 F.3d 147, 152 (5th Cir. 1999) (internal citations and quotations omitted). In addition, Fed. R. Civ. P. 60(d)(3) provides that a court may "set aside judgment for fraud on the court."

The Ninth Circuit has adopted the following definition of fraud on the court:

> "Fraud upon the court" should, we believe, embrace only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.

*In re Intermagnetics America, Inc.*, 926 F.2d 912, 916 (9th Cir. 1991) (citation omitted). Demonstrating fraud on the court under Rule 60(d) requires a party to show "an intentional, material misrepresentation" and "an unconscionable plan or scheme which is designed to improperly influence the court in its decision." *United States v.*

7

*Sierra Pac. Indus., Inc.*, 862 F.3d 1157, 1167–68 (9th Cir. 2017) (internal quotations omitted). "The relevant inquiry is not whether fraudulent conduct 'prejudiced the opposing party,' but whether it 'harmed the integrity of the judicial process.'" *Id.* at 1168 (quoting *United States v. Est. of Stonehill*, 660 F.3d 415, 444 (9th Cir. 2011)).

"The relevant misrepresentations must go 'to the central issue in the case,' and must 'affect the outcome of the case.*" Sierra Pac. Indus., Inc.*, 862 F.3d at 1168 (citation omitted). "In other words, the newly discovered misrepresentations must 'significantly change the picture already drawn by previously available evidence.'" *Id.* (citation omitted). "[P]erjury may constitute fraud on the court if it 'involves, or is suborned by, an officer of the court.'" *Id.* (citation omitted). Courts should "exercise the power to vacate judgments for fraud on the court 'with restraint and discretion,' and only when the fraud is established 'by clear and convincing evidence.'" *Est. of Stonehill*, 660 F.3d at 443 (internal citations omitted). There is no time constraint on a court's ability to vacate a judgment for fraud on the court. *See id.; see also Hazel-Atlas Glass Co.,* 322 U.S. 238 (setting aside judgment for fraud on court nine years after judgment entered).

## ARGUMENT

**I.    Rauchway and Edwards intentionally provided falsified data that was never recorded as part of a scheme to improperly influence MT DEQ investigators and the jury.**

The Ninth Circuit has determined "fabrication of evidence by a party in which an attorney is implicated will constitute a fraud on the court." *Trendsettah USA, Inc. v.*

*Swisher Intl. Inc.,* 31 F.4th 1124, 1134 (9th Cir. 2020) *cert. denied*, 143 S. Ct. 486, 214 L. Ed. 2d 277 (2022) (quoting *United States v. Buck*, 281 F.3d 1336, 1342 (10th Cir. 2002)); *see also Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1131(9th Cir. 1995) (citation omitted) ("Fraud upon the court includes both attempts to subvert the integrity of the court and fraud by an officer of the court.") Here, the Court should vacate the judgment entered in favor of Defendant Big Sky Water & Sewer District because Mr. Edwards created falsified evidence that he provided to Montana DEQ investigators before the trial in this case and Mr. Rauchway then furthered the scheme of escaping Clean Water Act liability by suborning Mr. Edwards into providing the federal jury with the falsified evidence.

"Most fraud on the court cases involve a scheme by one party to hide a key fact from the court and the opposing party." *Estate of Stonehill*, 660 F.3d at 444. The key fact in this case is that Edwards told MT DEQ investigators and a federal jury that effluent did not leak from its holding ponds because it was exported to the Yellowstone Club and Spanish Peaks, but the supposed exports were never actually recorded. Ex. 6 at 42–43. Mr. Edwards and Mr. Rauchway intentionally misrepresented falsified data as true and hid from the Montana DEQ and the Court the key fact that the data never existed. Mr. Rauchway walked Mr. Edwards and the jury through detailed calculations using the falsified data to disprove Cottonwood's calculations regarding leakage from the holding ponds. Ex. 5 at 206. Cottonwood

learned through a deposition of Mr. Edwards during subsequent litigation that the

export data he and Mr. Rauchway presented to the federal jury and Montana DEQ

was falsified. Ex. 6 at 42–43. Cottonwood sent a letter to Rauchway and other

attorneys that represented Edwards and the Sewer District providing them with

Montana Rule of Professional Conduct 3.3, which required them inform this Court

and the Gallatin County District Court of the falsified data and false impression it

gave the Courts and jury. Ex. 8. Attorneys for Mr. Edwards did not respond.[2]

In *Pumphrey v. K.W. Thompson Tool Co.*, the Ninth Circuit determined there was

fraud on the court in a wrongful death case involving a gun being dropped and

misfired while the safety was on. 62 F.3d 1128, 1130 (9th Cir. 1995). The defendant

introduced a video demonstrating that "the safeties performed as designed, and the

gun never fired." *Id.* at 1130.  However, discovery in a different lawsuit revealed the

---

[2] Cottonwood originally named Edwards as a defendant in his official capacity as
manager of the Sewer District. Doc. 1. The Court dismissed Edwards as a Defendant
after finding "Plaintiffs will not be denied any form of relief if the Court dismisses
Ron Edwards." Doc. 89 at 15. Edwards could not have been acting in his official
capacity as manager of the Sewer District when he provided falsified data to the MT
DEQ investigators and jury. *See* § 75-5-633, MCA (making it unlawful for a person to
falsify monitoring data); § 45-7-208, MCA (making it unlawful for a person to
knowingly make a false entry in or false alteration of any record or to make, use, or
present any record knowing it to be false with the purpose that it be taken as a
genuine part of information); § 45-7-203, MCA, (making it unlawful for a person to
mislead a public servant that is performing an official function by submitting any
writing that the person knows to be forged, altered, or otherwise lacking in
authenticity).

existence of an earlier video, prepared at the same time as the trial video, 'showing

that the [gun] fired when dropped during testing." *Id.* This earlier video was never

provided to Pumphrey. *See id.* The Ninth Circuit concluded that introduction of the

video depicting the safeties performing as designed constituted fraud on the court. *Id.*

at 1131. The Court determined that it did not matter whether the Plaintiff would have

won had he known the defendant failed to disclose the hidden tape. *Id.* at 1132–33.

Instead, the court reasoned that defendant, through counsel, "undermined the judicial

process" through failure to disclose the earlier video, affirmatively mischaracterizing

the test results, and letting stand uncorrected "the false impression created by" the

witness who performed the tests. *Id.* at 1133.

Here, Rauchway and Edwards undermined the judicial process by providing the

federal jury with falsified export data and giving the Court and the jury the impression

that Cottonwood's expert had "misinterpret[ed] the leakage data," when in fact the

data that was provided to the jury never existed. Doc. 198 at 2. Cottonwood has

presented clear and convincing evidence that either Big Sky Water & Sewer District or

its attorneys were responsible for "an intentional, material misrepresentation directly

aimed at the court." *Trendsettah*, 31 F.4th at 1134 (citation omitted).

## CONCLUSION

For the foregoing reasons, the Court should vacate the judgment and order a

new trial at the same time with Defendant Boyne USA, Inc. The Big Sky Water &

Sewer District and Boyne should be tried to together in November because U.S. EPA investigators raised the possibility that "irrigating the Meadow Village Golf Course" was responsible for tracer dye discharges from the underdrain pipe below the holding ponds. Ex. 9 at 8. Montana DNRC has stated the flow out of the underdrain pipe "is dependent on snow and rainfall as well as golf course irrigation practices." Doc. 29-1 at 2.

Respectfully submitted this 17th day of March, 2025.

/s/ John Meyer
JOHN MEYER

*Attorney for Plaintiff*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of L.R. 7.1(d)(2)(A), containing 2,990 words (excluding caption, certificate of compliance, table of contents and authorities, exhibit index, and any certificate of service), as verified by the word count feature of Microsoft Word, the word processor that created it.

/s/ John Meyer
JOHN MEYER

*Attorney for Plaintiff*

12

## CERTIFICATE OF SERVICE

I certify that on March 17th, 2025, I served the foregoing brief via CM/ECF on counsel for

defendants listed below:

Jacqueline R. Papez
Cynthia D. Brooks
DONEY CROWLEY P.C.
P.O. Box 1185
50 South Last Chance Gulch, 3rd Floor
Helena, MT 59601
Telephone: (406) 443-2211
Facsimile: (406) 449-8443
jpapez@doneylaw.com
cbrooks@doneylaw.com

Ian McIntosh
Neil Westesen
CROWLEY FLECK, PLLP
1915 South 19th Avenue
P.O. Box 10969
Bozeman, MT 59719
 Telephone: (406) 556-1430
imcintosh@crowleyfleck.com
nwestesen@crowleyfleck.com

*Attorneys for Defendant Boyne USA, Inc.*

Jonathan W. Rauchway (Admitted Pro Hac Vice)
Mave Gasaway (Admitted Pro Hac Vice)
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, CO 80202
Telephone: (303) 892-9400
Facsimile: (303) 893-1379
jon.rauchway@dgslaw.com
Mave.Gasaway@dgslaw.com

*Counsel for Defendants*

/s/ John Meyer
JOHN MEYER

*Attorney for Plaintiff*

13